# 26-0925

**IN UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

DAVID J. NASTRI, ESQ.; WE THE PATRIOTS USA, INC.

*Plaintiffs-Appellants*

v.

TODD BLANCHE, in his official capacity only; DAVID STEINER, in his official capacity only,

*Defendants-Appellees*,

---

On Appeal from the United States District Court for the
Connecticut, No. 3:24-cv-00222-VDO

---

**BRIEF OF THE PLAINTIFFS-APPELLANTS**

---

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
Fax: (203) 672-6551
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs-Appellants*

July 13, 2026

## FRAP 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant – We The Patriots USA, Inc. – is a non-governmental corporation that does not have any parent entities, and no parent entity or publicly held company owns any percentage of its stock.

i

## TABLE OF CONTENTS

FRAP 26.1 DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ..............................................................v

INTRODUCTION ........................................................................1

JURISDICTION.........................................................................3

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE.................................................................3

    I.    Background.......................................................................4

        A.   The federal post office firearms ban. ...........................................4

        B.   David J. Nastri, Esq...........................................................5

        C.   We The Patriots USA, Inc. ("WTP")...............................................7

        D.   Post offices' integration into the community...................................7

    II.   Procedural History And The Decision Below. ......................................8

SUMMARY OF THE ARGUMENT ...............................................................10

ARGUMENT ..............................................................................13

    I.    The District Court Erred By Concluding That The United States Met Its Burden To Show Well-established And Representative Historical Analogues To Its Ban On Carrying Firearms For Self-Defense In Post Offices. ........................13

ii

A.   Standard of review. ...................................................................13

B.   The district court erred by applying the nuanced approach without first identifying the unprecedented societal concern or dramatic technological change *Bruen* requires. ................................................................14

C.   The district court erred by applying *Antonyuk*'s crowded-place tradition to a federal statute, where that tradition depends on Reconstruction-era evidence inapplicable for federal Second Amendment challenges and a Founding-era source that was never actually a law. ............................................................18

D.   Even applying the nuanced analogical approach, *Antonyuk*'s crowded places doctrine, and Reconstruction-era laws, the United States failed to identify a well-established and representative analogue, and the district court manufactured one through recharacterization rather than historical evidence..25

E.   The United States' "sensitive places" analogues independently fail because the animating purpose of restricting firearms before governmental officials conducting deliberative proceedings does not remotely resemble a post office. ................................................................................40

F.   Even if the historical record were genuinely ambiguous, historical ambiguity does not satisfy the United States' burden under *Bruen*. .................51

iii

II. The Court Should Reverse The District Court's Decision And Remand This Case For It To Determine The Proper Scope Of A Permanent Injunction And To Award Costs And Attorneys' Fees As Appropriate. ...........................................58

    A. Standard of review. ...................................................................58

    B. The United States conceded that a permanent injunction is the appropriate remedy if the Court agrees that the Appellants demonstrate actual success on the merits.................................................................................59

    C. Any remand should be narrow and limited to the determination of the scope of a permanent injunction, costs, and attorneys' fees. ...........................59

CONCLUSION ....................................................................................61

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION.......63

CERTIFICATE OF SERVICE ................................................................64

iv

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024).................................................

.......................................................... 9, 14, 17, 21, 22, 23, 26, 30, 32, 35, 56

*Christian v. James*, 176 F.4th 189 (2d Cir. 2026).......................................30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................19

*E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92 (2d Cir. 2012) .........................59

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ......................58

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................60

*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020).....................20

*Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507 (2022) ..........................20

*Loomis v. ACE American Insurance Company*, 91 F.4th 565 (2d Cir. 2024).........14

*McDonald v. City of Chicago, Ill*, 561 U.S. 742 (2010).........................20

*Nastri v. Bondi,* No. 3:24-cv-00222 (VDO), 2026 WL 821682 (D. Conn. Mar. 25, 2026) .............................................................................................................4

*New York Progress and Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)...60

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................60

*NYSRPA v. Bruen*, 597 U.S. 1 (2022)......................................................

.................................... 10, 14, 15, 16, 18, 19, 20, 25, 26, 29, 36, 41, 47, 52, 53, 54

*Rex v. Dewhurst*, 1 State Trials, N.S. 529 (1820)....................................56

*Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75 (K. B. 1686) ............... 52, 56

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) .................................................. 24, 57

*State v. Langford*, 10 N.C. (3 Hawks) 381 (1824).......................................... 24, 57

*United States v. Ayala*, 711 F.Supp.3d 1333 (M.D.Fla 2024) ................................16

*United States v. Hemani*, 146 S.Ct. 1677 (2026)...................... 26, 27, 28, 43, 44, 48

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ...........................................37

*United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025)...............................................21

*Virginia v. Moore*, 553 U.S. 164 (2008).................................................................20

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024).....................................................34

*Wolford v. Lopez*, 2026 WL 1825723 (U.S. S.CT. June 25, 2026) ...........................

................................................................................. 33, 34, 35, 48, 49, 50

*Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025)..........................................................21

**Statutes**

1647 Md. Laws 216 ..................................................................................... 42, 54

1650 Md. Laws 273 ..................................................................................... 42, 54

1786 Va. Acts 33, ch. 21 .............................................................................. 42, 54

1786 Va. Acts 35, Ch. 49 ...................................................................................22

18 U.S.C. § 922............................................................................................ 26, 27

18 U.S.C. § 930.....................................................................................................

................. 1, 3, 4, 5, 7, 9, 10, 13, 17, 18, 32, 40, 43, 44, 45, 47, 50, 51, 59, 60, 61

vi

2 Edw. 3, c. 3 (1328)............................................................................ 41, 54

28 U.S.C. § 1291 ............................................................................................3

28 U.S.C. § 1331 ............................................................................................3

7 Edw. 2, 170 (1313).....................................................................................40

Conn. Gen. Stat. § 29-35..............................................................................49

**Other Authorities**

1 Calendar of the Close Rolls, Edward III, 1327-1330 (Nov. 10 and 11, 1328)

  (H.C. Maxwell-Lyte ed., 1896) .................................................................55

Act of Jan. 26, 1787 N.Y. Laws 345.......................................................... 43, 44, 55

Collection of Statutes of the Parliament of England in Force in the State of North

  Carolina (F. Martin Ed. 1792) .................................................................23

D. Conn. L.R. 56 ...........................................................................................5

Del. Const. Art. 28 (1776) ......................................................... 43, 45, 55

Dunham Tavern Museum, *Old Fashioned Elections* ..............................46

Early American Elections Project, *Electing Members of Congress in the Early*

  *Republic* ..................................................................................................46

Fed. R. Civ. P. 56 ........................................................................................14

Fed. R. Evid. 201 ................................................................... 36, 37, 38

John Bond, *A Compleat Guide for Justices of the Peace* (Bond, 3rd ed. 1707).......56

Letter to Keeper and Justices of Northumberland (Oct. 28, 1332), in 2 H. Maxwell-Lyte ed., *Calendar of the Close Rolls, Edward III, 1330-1333* (London: Her Majesty's Stationery Office, 1898)........................................................55

Michael Dalton, *The Country Justice* (1690)............................................56

Museum of the American Revolution, *How Did They Vote?* .................................46

Richard Burn, *The Justice of the Peace and Parish Officer* (16th ed. 1788) ...........56

Richard Wingate, *An Exact Abridgment of all Statutes in Force and Use From the Beginning of Magna Charta, until 1641* (1684)....................................................56

Serjeant William Hawkins, 1 *A Treatise of Pleas of the Crown, or a System of the Principal Matters relating to that Subject, Digest Under Proper Heads* (1716).56

Sir Edward Coke, *Institutes of the Lawes of England*, 1628 (3 Inst. 158) ..............56

Stephen Halbrook*, The Right to Bear Arms: A Constitutional Right of The People Or A Privilege Of The Ruling Class* (Bombardier Books 2021)..........................55

Stephen P. Halbrook, *How A Fake Citation Misled Courts To Uphold "Sensitive Place" Gun Bans: The Second Circuit's Misunderstanding Of Founding-Era Law On Going Armed*, 2 Texas A&M J.L. & Civ. Governance 433 (2026). 23, 24

The Charter and Ordinances of the City of Providence with the Acts of the General Assembly Relating to the City, Page 60, Image 61 (1835) ...................................47

viii

## <u>INTRODUCTION</u>

18 U.S.C. § 930(a) prohibits law-abiding Americans from carrying handguns for self-defense in post offices. Despite post offices existing prior to the Founding, our nation did not adopt any such ban until 1972.

Our Founders understood sensitive places. They restricted firearms in deliberating legislatures, before courts in session, and at polling places on Election Day. In each instance, the same logic applied: the deliberative acts of self-government cannot reliably occur when those conducting them face armed intimidation. The Founders restricted firearms where that threat was real and where the integrity of deliberative self-government depended on freedom from it.

They did not restrict firearms in post offices. Not because post offices were rare — they were operated by the Continental Congress before the Constitution was ratified. Not because the Founders were unaware that post offices were government facilities — they built them. But because a post office is not a deliberative proceeding, a postmaster processing mail is not a judge adjudicating cases, and the right to send a letter does not depend on freedom from armed coercion the way the right to vote does on Election Day. The Founders drew that line. This case is about whether the district court was right to erase it.

Appellant David Nastri is an attorney, financial advisor, and veteran who carries a firearm for self-defense. When he visits his post office in Cheshire,

1

Connecticut and members of Appellant We The Patriots USA, Inc. visit their local post offices, they enter facilities that often share the same spaces as restaurants, pharmacies, and hair salons. Federal law requires them to disarm or become federal criminals. The restaurants and salons have no such restrictions. Only the Post Office – different in no meaningful way – transforms their exercise of their Second Amendment rights into a federal crime.

The district court acknowledged that no such laws existed until 1972. That acknowledgment reflects an unbroken historical reality: no Founding-era law restricted firearms in postal facilities. Under Supreme Court precedent, that silence is not a footnote to the analysis. It is the analysis.

The district court treated it as neither. Instead of conducting the straightforward analysis required by Supreme Court precedent, the district court borrowed a Reconstruction-era tradition built for state law challenges and held that post offices are crowded places where lawful firearms carriage may be banned. As a backup, it recharacterized a narrow historical tradition of protecting legislative deliberations and judicial adjudications as a broad historical tradition of prohibiting firearms in any building where government business is conducted.

Each of these conclusions violate Supreme Court precedent and reduce the Second Amendment to a second-class right. The Appellees have identified no historical evidence justifying the restriction on the Appellants' Second Amendment

2

rights. The district court was not permitted to invent that evidence for them. Accordingly, this Court should find that 18 U.S.C. § 930(a) as applied to post offices violates the Second Amendment, reverse the district court's decision, and remand for the district court to consider the proper scope of a permanent injunction.

## JURISDICTION

The Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court had federal question jurisdiction under 28 U.S.C. § 1331. The Appellants timely filed their notice of appeal on April 10, 2026. App.603.

## STATEMENT OF THE ISSUES

I. Whether the district court erred in concluding that the United States met its historical burden to show well-established and representative historical analogues to its categorical ban on carrying firearms for self-defense in post offices.

II. If the Court reverses the district court's grant of summary judgment to the United States, whether remand is appropriate to permit the district court to determine the scope of a permanent injunction in this case.

## STATEMENT OF THE CASE

This is an appeal from an order and judgment of the United States District Court for the District of Connecticut (Oliver, J.) denying summary judgment to Plaintiffs David Nastri and We The Patriots USA, Inc. and granting summary

judgment and final judgment to the then-federal defendants, Pamela Jo Bondi[1] and David P. Steiner. SPA.1-27;[2] *Nastri v. Bondi,* No. 3:24-cv-00222 (VDO), 2026 WL 821682 (D. Conn. Mar. 25, 2026).

Appellants filed the underlying lawsuit on February 20, 2024 and sought declaratory and injunctive relief against federal officials for their enforcement of 18 U.S.C. § 930(a) in United States Post Offices. App.607. The parties filed cross-motions for summary judgment, and Appellants sought permanent injunctive relief in their cross-motion. App.1, 335. The district court denied the Appellants' motion, granted the Appellees' motion, and denied the Appellants permanent injunctive relief. SPA.1-27. This appeal timely followed. App.603.

## I.     Background.

### A. The federal post office firearms ban.

18 U.S.C. § 930(a) prohibits carrying firearms or other weapons in federal facilities on pain of incarceration. Post offices – owned and operated by the federal government through the United States Postal Service – fall within 18 U.S.C. § 930(g)(1)'s definition of federal facilities. These two provisions are supplemented by 18 U.S.C. § 930(h), which only permits a conviction if a sign prohibiting weapons

---

[1] Appellee Todd Blanche has since replaced Bondi as acting Attorney General of the United States, and he was properly substituted. This brief will refer to the Appellees as "the United States."

[2] SPA citations refer to the Special Appendix filed with Nastri's brief.

4

in a federal facility is conspicuously posted or if the person has actual notice of the law.

Despite these prohibitions, 18 U.S.C. § 930(d)(3) permits "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes." The federal government, however, has never taken the position that carrying a firearm for the purpose of self-defense is a "lawful purpose" within the meaning of 18 U.S.C. § 930(d)(3). Instead, the federal government takes the position that the "lawful purposes" exception provided by 18 U.S.C. § 930(d)(3) does not include self-defense. *See United States v. Ayala*, 8:22-cr-00369, Dkt. 32, pp. 18-22 (M.D.F.L.).

Accordingly, 18 U.S.C. § 930(a) operates to prohibit law-abiding citizens from carrying firearms for self-defense when they enter a post office to transact business.

**B. David J. Nastri, Esq.**

Appellant David J. Nastri is a combat veteran, financial advisor, attorney, and active participant in his community.[3] App.105. Nastri earned his M.B.A. in 2001 from Quinnipiac University. App.106. As a financial advisor, he currently holds four

---

[3] The United States objected, as irrelevant, to virtually every fact about Nastri's background because it conceded standing. App.366-380. It did not dispute them in the parties' statements of material facts, and those facts were undisputed under D. Conn. L.R. 56.

FINRA licenses, including a Series 7, a Series 63, a Series 66, and a Life & Health license. App.106. In addition to passing the rigorous background checks required for these licenses, Nastri holds a clean disciplinary record for his financial licenses. App.106.

Nastri then earned his law degree in 2018 from Quinnipiac University. App.106. He became a licensed Connecticut attorney in 2018, and he remains in good standing with no disciplinary history. App.106. Nastri has represented numerous veterans in a pro-bono capacity in Veterans' Administration matters during his spare time. App.106.

In 2009-10, Nastri deployed to Afghanistan as a Staff Sergeant in the Connecticut Army National Guard in support of Operation Enduring Freedom. App.105. Nastri earned several awards during his military service, including the Afghanistan Campaign Medal with a Campaign Star, the Army Good Conduct Medal, and the Louisiana Emergency Service Medal. App.105. He received an honorable discharge in March 2012. App.105.

Nastri has held a Connecticut pistol permit for approximately 30 years. App.106. In addition to the civilian training he received when he obtained his pistol permit, Nastri received comprehensive training during his military service on the safe and effective use of firearms, and he was required to demonstrate proficiency under combat conditions. App.105-06.

6

Nastri carries a handgun for self-defense almost every place he goes. App.106.

Nastri rents a post office box at the United States Post Office located at 210 Maple Avenue, Cheshire, Connecticut 064410 ("the Cheshire Post Office"). App.107. He enters the Cheshire Post Office at least once or twice a month to check his mail. App.107. He intends to carry a handgun for self-defense whenever he enters the Cheshire Post Office just like he does when he goes any other place where its possession is not prohibited. App.107. He would like to do so without incurring federal criminal prosecution through the Appellees' enforcement of 18 U.S.C. § 930(a). App.107.

### C. We The Patriots USA, Inc. ("WTP")

Appellant WTP is a non-profit public charity dedicated to promoting constitutional rights through education, outreach, and public interest litigation. App.104. As of October 29, 2024, it had 18,523 members across the United States. App.105. Each member of WTP is subject to 18 U.S.C. § 930(a)'s prohibition against carrying firearms for self-defense in post offices.

David Nastri is a member of WTP. App.104.

### D. Post offices' integration into the community.

American post offices have always integrated into their communities since the days of Benjamin Franklin. App.111. The modern day post office is no different.

7

For instance, the Cheshire Post Office is situated at the corner of intersection, and a bank, a drug store, a gas station, and several other businesses are all around it. App.107.

Other post offices are similarly or even more integrated. App.107-110. For example, the Branford Post Office located at 5 Court Street, Branford, Connecticut 06405 is immediately adjacent to a pizza restaurant. App.108-09. The Bridgeport Post Office located at 115 Boston Ave., Bridgeport, Connecticut 06610 is located in a commercial shopping center and shares the same building with a beauty supply store, a check cashing business, a pharmacy, and a Dollar & Deals store. App.109.

## II. Procedural History And The Decision Below.

The Appellants filed the underlying lawsuit on February 20, 2024. App.607. The parties then agreed to forego discovery and file cross-motions for summary judgment, and the district court adopted their proposal. App.609. After briefing, the district court denied the Appellants' motion for summary judgment and granted the United States' motion for summary judgment. SPA.1-27.

The district court first held that the Appellants had standing. SPA.4-7. It explained that Nastri had held a pistol permit for over three decades, carries a handgun for self-defense almost every place he goes, and intended to carry a handgun into a federal post office that he visits at least once or twice a month. SPA.5-6. It found that he had demonstrated a sufficiently imminent threat of enforcement.

8

SPA.5-6. The district court concluded that WTP had demonstrated that Nastri was a member, was suffering a threatened constitutional injury, was pursuing interests germane to its purpose, and did not require individual member participation to proceed. SPA.6-7. Accordingly, it held that WTP demonstrated associational standing. SPA.6-7.

The district court then concluded that the Appellants had demonstrated that the Second Amendment's plain text protected their proposed conduct. SPA.11.

The district court, however, held that the United States met its burden to establish a well-established and representative historical analogue to 18 U.S.C. § 930(a)'s prohibition on carrying firearms in post offices. SPA.13. It first concluded that post offices fell within *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)'s "crowded-places" tradition. SPA.13-19. To reach this conclusion, it judicially noticed a survey from the Postal Service's Office of Inspector General and its methodology for estimating foot traffic at post offices. SPA.18. It then applied this methodology to 2024 statistics on the number of customer visits to post offices, and divided it by the total number of post offices in the United States to estimate 200 visitors per day per post office. SPA.18.

The district court also concluded that there was a broad historical tradition of banning firearms in government buildings. SPA.15-16. It surveyed laws proffered

9

by the United States, which dated back to 1313 to find a well-established historical tradition of prohibiting the carriage of arms in government buildings. SPA.15-16.

Accordingly, the district court rejected the Appellants' Second Amendment challenge to 18 U.S.C. § 930(a).

The Appellants now appeal.

## SUMMARY OF THE ARGUMENT

After correctly finding that the Second Amendment's plain text protects the Appellants' right to carry firearms for self-defense in post offices, the district court placed the burden on the United States to demonstrate that 18 U.S.C. § 930(a) is consistent with this Nation's history and tradition of firearms regulation. The United States failed to carry that burden, and the district court erred by concluding otherwise.

The district court's first error was applying *Bruen*'s more lenient, tradition-based analogical framework without first identifying the "unprecedented societal concern or dramatic technological change" *NYSRPA v. Bruen*, 597 U.S. 1 (2022) requires before departing from a straightforward analysis. That error was outcome-determinative: the district court acknowledged that no law restricted firearms at post offices until the 1970s, and postal systems predate the Founding and have operated continuously since. Under the straightforward framework, that historical silence is dispositive. The district court's conclusion that modern architecture and foot traffic

10

justified departing from the straightforward framework permits the government to escape rigorous historical analysis simply by asserting that times have changed — the precise reasoning *Bruen* forbade.

Even if *Bruen*'s nuanced approach applied, the district court's application of *Antonyuk*'s "crowded-place" tradition to a federal statute was erroneous on two grounds. First, *Antonyuk* developed that tradition primarily from Reconstruction-era evidence that cannot properly be consulted to justify a federal statute. The Second Amendment has constrained Congress since 1791, not since 1868, and the Fourteenth Amendment's incorporation mechanism provides no textual basis for applying 1868 understandings to challenges to federal statutes. Second, *Antonyuk*'s only Founding-era bridge to a pure location-based restriction – a compilation purporting to assemble North Carolina law – was never enacted as law, was criticized as unreliable by North Carolina's 1833 statutory commission, and was twice contradicted by the North Carolina Supreme Court's holdings that North Carolina law only prohibited terroristic conduct. Accordingly, there is no Founding-era support for a "crowded-places" tradition.

Even accepting *Antonyuk*'s tradition as binding and permitting Reconstruction-era evidence, the United States still failed. The Supreme Court's recent *Hemani* decision requires a close correspondence between the actual operation of a historical law and the modern statute; the district court substituted

11

speculated about what the Founders would have enacted if Founding-era postal facilities had been built differently. If *Hemani* forecloses sustaining a modern restriction through historical laws that operated differently in mechanism and effect, it certainly forecloses sustaining one through no historical law at all.

The district court also erred by reducing *Antonyuk*'s confinement-and-congregation principle to a raw foot-traffic test. It reached its 200-visitors-per-day figure by taking judicial notice *sua sponte* of a 2017 retail analytics study — a commercial strategy document no party presented — and performing its own arithmetic with that study's tripling methodology. The study itself warned against the specific extrapolation the district court performed, presented four competing methodologies spanning a tenfold range of estimates, and was built on a non-representative sample of high-traffic post offices. *Wolford v. Lopez* independently forecloses such approaches: courts may not re-level facts or doctrine to higher levels of generality until historical fits appear.

The United States' laws independently fail. Its entire historical record — from a 1313 Parliamentary restriction to an 1835 discharge ordinance — consists of laws protecting specific deliberative acts of self-government. Their "how" was proceeding-specific, expiring when the official act ended; their "why" was preventing armed coercion of proceedings whose integrity depended on freedom from physical threat. Neither applies at post offices where no deliberation occurs.

12

The district court converted those narrow, proceeding-specific laws into a categorical principle covering all buildings where government business is conducted. *Wolford* holds this is not historical analysis — it is impermissible judicial invention.

Even if any layer of the historical record were genuinely ambiguous, *Bruen*'s footnote 11 requires that ambiguity to be resolved against the government, not in its favor. The government may not take refuge in historical uncertainty. Every law the United States produced admits of a narrower, textually plausible reading – and *Bruen* requires courts to adopt the narrower construction.

Because the United States failed to carry its historical burden, this Court should reverse the grant of summary judgment to the United States and the denial of the Appellants' cross-motion for summary judgment. It should remand this case for the district court to determine the scope of a permanent injunction enjoining enforcement of 18 U.S.C. § 930(a).

## **ARGUMENT**

I. **The District Court Erred By Concluding That The United States Met Its Burden To Show Well-established And Representative Historical Analogues To Its Ban On Carrying Firearms For Self-Defense In Post Offices.**

A. **Standard of review.**

The Court reviews "without deference the district court's grant of summary judgment when, as here, the parties filed cross-motions for summary judgment and

the district court granted one motion but denied the other." *Loomis v. ACE American Insurance Company*, 91 F.4th 565, 572 (2d Cir. 2024) (cleaned up). Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).

**B. The district court erred by applying the nuanced approach without first identifying the unprecedented societal concern or dramatic technological change *Bruen* requires.**

*Bruen* divided Second Amendment historical analysis into two tracks, and the choice between them is not a label without substance. Instead, it determines what legal significance attaches to the absence of on-point historical regulation. In "fairly straightforward" cases, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Only where a case implicates "unprecedented societal concerns or dramatic technological changes" may a court relax that standard and employ a "more nuanced approach" that examines whether the government has identified a "well-established and representative historical analogue." *Id*. at 27. Accordingly, this Court held that, "in examining history and tradition, a court must identify the 'societal problem' that the challenged regulation seeks to address…" before proceeding with historical analysis. *Antonyuk*, 120 F.4th at 970 (cleaned up).

14

Both *Bruen* and *Antonyuk* establish that the nuanced approach is the exception, not the default, because it applies only to cases concerning "unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27. Accordingly, courts must identify the unprecedented concern or technological change before they relax *Bruen*'s "straightforward" inquiry. Otherwise, the straightforward/nuanced distinction is meaningless, and the government could escape the Second Amendment's rigorous analysis simply by asserting that times have changed.

The district court, however, committed three errors by deploying *Bruen*'s nuanced approach. First, it concluded that *Bruen*'s nuanced approach applies without first finding an unprecedented societal concern or dramatic technological change. Second, the district court acknowledged that "Plaintiffs correctly point out that though post offices have existed since before the Founding, they were not subject to firearm restrictions until 1972." SPA.16. The district court then found that post offices had evolved from being hosted at private establishments at the Founding to standalone buildings in the modern era. SPA.16. The district court, however, never elaborated why this change presented an unprecedented societal concern or a dramatic technological change. SPA.16. Third, the district court ignored the United States' failure to establish any historical tradition of banning firearms in connection

15

with mail services and Post Offices in the Founding Era,[4] and its concession in similar litigation that "[t]here is no evidence of firearms being prohibited at post offices, specifically, or of postal workers being prohibited from carrying them, at the time of the founding." *United States v. Ayala*, 711 F.Supp.3d 1333, 1341 (M.D.Fla 2024) (citing the United States' supplemental brief) (cleaned up). Historical silence, however, is the essence of *Bruen*'s historical test. Courts may not disregard it to sustain firearms regulations that the sustained historical silence demonstrates "our ancestors would never have accepted." *Bruen*, 597 U.S. at 30 (cleaned up).

The district court's acknowledgment that (1) no firearms bans in post offices existed until 1972, (2) the United States' *Ayala* concession that none existed in the Founding Era and its failure to identify any here, and (3) the district court's failure to identify an unprecedented societal concern or dramatic technological change should have been dispositive in this case under *Bruen*'s straightforward approach. Postal systems are not a modern innovation. They predate the Founding and have operated continuously since, facing – in some form – every conceivable version of

---

[4] As discussed below, the relevant historical period is just the Founding Era, but the United States' failure went far beyond that. It failed to identify, in this case, a single law banning firearms in connection with mail services and Post Offices until 1972. While this Circuit may consider 30-40 years of historical silence insufficient, it has never gone so far as holding that 181 years of historical silence does not carry the day. Holding such would openly defy *Bruen* and blatantly substitute judicial policy inventions for "the balance struck by the founding generation." *Bruen*, 597 U.S. at 29.

16

the concerns the district court invoked to justify 18 U.S.C. § 930(a)'s categorical post office ban. SPA.20. There is nothing "unprecedented" about a building where citizens come and go to transact business. That is, and always has been since before the Founding, the basic nature of a retail counter or a similar establishment.

Rather than confronting these dispositive facts within the straightforward framework, the district court excused the absence of any historical regulations by reasoning that post offices "look very different than they did at the Founding" and serve many more people. SPA.18. The district court erred by treating a change in appearance and increased traffic as an unprecedented societal concern or a dramatic technological change because this Court already said that crowding is a societal concern that has existed since before the Founding. *See generally Antonyuk*, 120 F.4th 941.

The district court's approach inverts *Bruen*'s framework. Instead of requiring the government to justify relaxing its burden, the district court treated the mere facts of modern post offices being hosted in separate buildings and modern foot traffic as self-justifying — as though any case the government cannot win on a straightforward historical record automatically qualifies for the nuanced track. That cannot be right. If a bare assertion that "things are different now" were sufficient to unlock the nuanced approach, *Bruen*'s straightforward track would have no application to any

17

modern case, since every regulated activity has grown in scale since 1791. *Bruen* did not create that loophole, and this Court should not.

Because the district court never made the threshold finding *Bruen* requires, its reliance on the "well-established and representative" standard was error. On the straightforward record here — a continuous historical practice, a conceded absence of any Founding-era restriction, and no identified unprecedented concern — the United States' historical showing was insufficient as a matter of law because it failed to identify a tradition of "distinctly similar historical regulation[s]." *Bruen*, 597 U.S. at 26. Accordingly, the district court should have granted summary judgment to the Appellants.

**C. The district court erred by applying *Antonyuk*'s crowded-place tradition to a federal statute, where that tradition depends on Reconstruction-era evidence inapplicable for federal Second Amendment challenges and a Founding-era source that was never actually a law.**

The district court applied *Antonyuk*'s "crowded places" doctrine to uphold 18 U.S.C. § 930(a)'s post office ban. SPA.13-16. That application was error on two independent grounds. First, *Antonyuk* built that doctrine from Reconstruction-era evidence that cannot properly justify an Act of Congress because the Second Amendment's scope against the federal government has not changed since 1791. Second, *Antonyuk*'s only Founding-era bridge to a pure location-based restriction was a 1792 private compilation of English statutes that the author claimed were

North Carolina laws. That compilation, however, was never enacted by the North Carolina legislature, discounted as unreliable by North Carolina's statutory commission in 1833, and contradicted by North Carolina Supreme Court decisions interpreting the actual North Carolina law to require terroristic conduct, not mere carriage in crowded locations. Stripped of the Reconstruction-era evidence and the private compilation, what remains at 1791 is a single conduct-based Virginia statute that *Antonyuk* itself identified as an outlier — an insufficient foundation for the categorical federal firearms ban the district court upheld. Accordingly, applying a "sensitive places" tradition based on 1868 evidence is error, and the district court's application of that tradition was predicated on a factual misconception.

The Supreme Court explained in *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Accordingly, *Heller* discounted reliance on Reconstruction-era history and treated it only as confirmation of what the Founding-era history established. *Heller*, 554 U.S. at 614, 634-35. *Bruen* confirmed that the Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. To the extent that the Supreme Court left any doubt, it has only

19

acknowledged an academic debate over whether the Fourteenth Amendment's adoption changed the scope of the Bill of Rights. *Id*. at 37-38.

In other constitutional contexts, the Supreme Court has been clear that 1791 history controls. *See, e.g., Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 536 (2022) (holding that Establishment Clause doctrine must reflect the Founders' understanding); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (looking to the Founding-era to determine the scope of the Fourth Amendment). The Supreme Court has also been clear that historical traditions arising "in the second half of the 19[th] century… cannot by [themselves] establish an early American tradition." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020).

The Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago, Ill*, 561 U.S. 742, 780 (2010). 1791 history has always applied to cases involving federal law, and this one is no different. Just as the Establishment Clause, Fourth Amendment, and other Bill of Rights guarantees are understood against the federal government according to their Founding-era meaning, the Second Amendment demands the same treatment.

This Court has suggested that only 1791 history is relevant to assessing challenges to federal laws restricting Second Amendment rights: "we look to the prevailing understanding of the right to bear arms in… 1791 and time periods in

20

close proximity to 1791." *United States v. Vereen*, 152 F.4th 89, 99 (2d Cir. 2025) (cleaned up). It, however, has reserved that question on at least two occasions. *See id*. at 99 n.2; *Zherka v. Bondi*, 140 F.4th 68, 78 n.14 (2d Cir. 2025).

This question is outcome-determinative here. The Fourteenth Amendment's relevance to Second Amendment analysis derives solely from its function as an incorporation mechanism: it is what made the Second Amendment applicable to state governments. While academics may debate whether incorporation respoke the Second Amendment's meaning as to the states, that inquiry is irrelevant when it comes to the federal government. Congress is constrained by the original 1791 Second Amendment, not by any version allegedly respoken by the Fourteenth Amendment. There is no textual mechanism by which 1868 understanding governs historical analysis for a Second Amendment challenge to a federal statute.

*Antonyuk*'s finding of a well-established and representative tradition of prohibiting firearms in "crowded places" depended heavily on Reconstruction-era evidence that it argued mirrored the Statute of Northampton. *Antonyuk*, 120 F.4th at 1021-22. The core of its historical analysis rested on five Reconstruction-era state statutes (Tennessee (1869), Texas (1870), Missouri (1883), Arizona (1889), and Oklahoma (1890)) and eight municipal park ordinances enacted between 1861 and 1897. *Id*. at 1021-22.

To connect this Reconstruction-era history to medieval England, *Antonyuk* turned to two Founding-era sources – a 1786 Virginia law prohibiting going or riding armed "in terror of the county" and a 1792 book collecting statutes that the author believed were in effect in North Carolina. *Id*. at 1019-20. The Virginia law and the 1792 book present serious problems for historical analysis though.

First, the 1786 Virginia law does not support a pure locational-based restriction because it prohibited conduct. *See Antonyuk*, 120 F.4th at 1020 (finding that 1786 Va. Acts 35, Ch. 49 prohibited "going or riding armed by night[] or by day, in fairs or markets,… in terror of the county") (cleaned up). *Antonyuk* itself recognized that "the Virginia statute differed from the medieval English Northampton statute in that it prohibited *conduct* and not simply carriage, *i.e.*, bearing arms in 'terror' of the county…." *Id*. at 1020 n.82. *Antonyuk*, however, found that "the North Carolina statute, like the Northampton statute, appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct… [a]nd… the tradition of regulating firearms in quintessentially crowded places evolved in the direction of the North Carolina statute." *Id*. at n.82. After surveying the Reconstruction-era laws, *Antonyuk* stated again that "the tradition beginning with the Virginia and North Carolina laws evolved over the years between the Founding and Reconstruction toward the North Carolina model, *i.e.*, to prohibit firearms in quintessentially crowded places absolutely, without reference to behavior." *Id.* at

22

1039. *Antonyuk* then described the 1786 Virginia law as an "outlier among the national tradition" because of its conduct element. *Id*. at 1039.

Second, *Antonyuk* rested its North Carolina analysis on an assumption that the book it referenced was actually North Carolina law. *Id*. at 1020 (citing Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792)). The book, however, was not North Carolina law and did not accurately state it. *See* Stephen P. Halbrook, *How A Fake Citation Misled Courts To Uphold "Sensitive Place" Gun Bans: The Second Circuit's Misunderstanding Of Founding-Era Law On Going Armed*, 2 Texas A&M J.L. & Civ. Governance 433, 448-50 (2026) (explaining Francois-Xavier Martin's history and the lack of evidence that his compilation was ever authorized by the North Carolina legislature). Instead, as part of a broad statutory overhaul, North Carolina enacted a conduct-based affray statute in 1749 that replaced the Statute of Northampton. *Id*. at 444. North Carolina then commissioned future U.S. Supreme Court Justice James Iredell in 1787 to compile North Carolina's laws, and his compilation, including the same conduct-based affray statute, was enacted by the North Carolina legislature in 1791. *Id*. at 447. Iredell's compilation included North Carolina's earlier, conduct-based affray statute. *Id*. at 447. In 1800, then-North Carolina Judge and former North Carolina Attorney General John Haywood authored a manual for justices of the peace in which he explained that this law only

23

prohibited conduct terrorizing people. *Id*. at 451. Moreover, North Carolina's 1833 statutory commission specifically criticized Francois Martin's 1792 compilation as being unreliable. *Id*. at 449-50 (noting that this commission included North Carolina's governor and two future North Carolina Supreme Court justices). In sum, the historical evidence demonstrates that, contrary to *Antonyuk*'s finding, Martin's compilation was never North Carolina law and inaccurately stated North Carolina law in many ways.

There is more. The North Carolina Supreme Court twice rejected any suggestion that North Carolina's laws prohibited anything more than the use of weapons to breach the peace. *See State v. Langford*, 10 N.C. (3 Hawks) 381 (1824); *State v. Huntly*, 25 N.C. (3 Ired.) 418, 418-19 (1843). In other words, every authoritative source indicates that the "1792 North Carolina law" that *Antonyuk* relied on did not exist.

What remains is a complete absence of any Founding-Era law imposing a pure locational-based restriction on the lawful bearing of arms for self-defense. Accordingly, there is no Founding-era model statute toward which later statutes enacted after 1791 could evolve, because the evolution *Antonyuk* described – from conduct-based restriction to pure location-based bans – is itself a Reconstruction-era phenomenon with no Founding-era starting point. Instead, the Reconstruction-era statutes that form the bulk of *Antonyuk*'s tradition post-date the relevant historical

24

period for challenges to federal statutes and cannot supply the well-established and representative tradition the government must demonstrate.

The Court should conclude that the United States has failed to carry its historical burden here.

> **D.** **Even applying the nuanced analogical approach, *Antonyuk*'s crowded places doctrine, and Reconstruction-era laws, the United States failed to identify a well-established and representative analogue, and the district court manufactured one through recharacterization rather than historical evidence.**

Even if the nuanced approach properly applied here, the United States still failed to carry its burden. The nuanced approach requires the United States to identify a "well-established and representative historical analogue" to justify its regulation. That historical analogue must still be genuinely analogous: it must address "how" and "why" the historical regulation burdened the right to armed self-defense in a manner comparable to the modern restriction. *Bruen*, 597 U.S. at 28-29. The district court did not hold the United States to that standard. Instead, it substituted narrative reconstruction and a statistical recharacterization for the historical evidence *Bruen* requires.

> **1.** **The district court's reasoning that post offices' architecture has changed is not historical analysis; it is a means of excusing the absence of any analogue, which *Hemani* forecloses.**

The United States identified no Founding-era law restricting firearms in or around post offices, mail carriers, or postal facilities of any kind. App.335-365,

25

SPA.16. Rather than treat that "lack of a distinctly similar historical regulation"[5] as evidence against the United States's position – as the straightforward framework would require, and as even the nuanced framework requires once an analogue is actually offered – the district court reasoned that the absence is unremarkable and irrelevant because post offices at the Founding were not standalone government buildings, but were instead housed within taverns, inns, coffee houses, and private residences. SPA.16-17. The district court speculated that post offices likely would have been restricted, had they existed in their modern form, and the lack of any historical restriction is not probative of anything.

This reasoning inverts the analogical inquiry rather than faithfully performing it. *Bruen* and *Antonyuk* require the United States to identify an actual historical regulation and show that its "how" and "why" are relevantly similar to the modern one. *Antonyuk*, 120 F.4th at 970. They do not permit a court to manufacture a historical analogue and its "how" and "why" by speculating about what legislators would have done if Founding-era and Reconstruction-era postal facilities had been built differently than they were.

*United States v. Hemani*, 146 S.Ct. 1677 (2026) confirms that this distinction matters. *Hemani* held that historical vagrancy, civil-commitment, and surety laws targeting habitual drunkards were not "closely analogous" to 18 U.S.C. § 922(g)(3)'s

---

[5] *Bruen*, 597 U.S. at 26.

categorical disarmament of all drug users, because the way those historical laws actually operated differed significantly from how 18 U.S.C. § 922(g)(3) operated today. *Hemani*, 146 S.Ct. at 1687-1691. It explained that habitual drunkard laws applied only to individuals who consumed so much alcohol as to lose the power of managing his own affairs. *Id*. at 1688. Vagrancy laws targeted those who did not meet the societal definition of work for confinement to jail or workhouses. *Id*. at 1689-90. Civil commitment laws targeted habitual drunkards for confinement in asylums so they could be rehabilitated and did not financially ruin their families. *Id*. at 1690. Surety laws required "good behavior" from individuals who threatened scandal to their families. *Id*. at 1691. Unlike these laws, 18 U.S.C. § 922(g)(3) did not address specific harms or individuals who posed unusual danger to the community. Instead, it categorically disarms anyone who occasionally smokes a moderate amount of marijuana, someone who takes a spouse's prescription Ambien to sleep, or a college student who uses a friend's Adderall for study cramming. *Id*. at 1689. Accordingly, *Hemani* held that 18 U.S.C. § 922(g)(3) violated the Second Amendment, finding that the government's analogues failed "on every single metric the government invites us to consider." *Id*. at 1687.

*Hemani*'s insistence on a close relationship between a historical law's actual operation and a modern statute's actual operation drew unanimous agreement from the justices – even the ones who only concurred in the judgment. Accordingly,

27

*Hemani* places beyond doubt that the "how" and "why" inquiry requires a tight fit between a historical law's actual operation and a modern statute's actual operation.

*Hemani* confirms that the inquiry into a historical law's "how" and "why" may not sustain a modern law based on a generalized family resemblance to the historical law, and certainly may not rest on a principle invented to bridge a gap in the historical record. The district court's reasoning here is a more extreme version of the maneuver *Hemani* rejected. In *Hemani*, the United States at least pointed to historical statutes and argued, unsuccessfully, that they were close enough of a historical analogue. *See generally Hemani*, 146 S.Ct. 1677. Here, the United States did not even offer a real historical statute restricting firearms at any facility resembling a post office. Instead, it offered a structural narrative about what historical post offices were physically like, and the district court treated that narrative as a substitute for the missing historical laws themselves. If *Hemani* forecloses sustaining a modern law through historical laws that operated differently in mechanism and effect, it certainly forecloses sustaining one through a court's own account of why one might have existed. The district court's acknowledgment that no such laws existed, SPA.16-17, should have ended the inquiry.

In resorting to architectural speculation to reach the contrary conclusion, the district court committed the precise error *Bruen* forbids: "courts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry." *Bruen*,

28

597 U.S. at 29 n.7. This prohibition not only applies to direct application of "means-end scrutiny," but it also applies to interest-balancing disguised as historical analysis. *Id*. Instead, federal judges must apply the interest-balancing struck by the "founding generation." *Id*. Despite this clear command, the district court essentially arrogated to itself the historical judgment the Founders made rather than faithfully applying it.

### 2. **The district court's reliance on modern foot-traffic statistics to extend *Antonyuk*'s crowded-place doctrine to post offices is the same recharacterization *Wolford v. Lopez* rejected, and the statistics themselves cannot bear the weight the district court placed on them.**

The district court also erred by holding that post offices qualify as "sensitive places" because they now receive substantial public foot traffic. SPA.18. It cited United States Postal Service visitor figures for 2024 and extrapolated, through a tripling methodology drawn from a 2017 Inspector General white paper that no party cited or placed in the record, an estimate of nearly two billion annual visits nationwide, or roughly 200 visitors per post office per day. SPA.18. From that calculation, the district court concluded that post offices belong in the same category of crowded places that *Antonyuk* addressed. SPA.18. This reasoning fails on two independent grounds: (1) it misapplies *Antonyuk*, and (2) it rests on a statistical finding that the district court was not procedurally authorized to make under its judicial notice power.

29

**(a)** **Foot traffic volume does not establish the sustained congregation and confinement *Antonyuk* requires, and the district court's own source affirmatively contradicts its conclusions.**

*Antonyuk*'s crowded-place doctrine[6] rests on shared features of sustained congregation and confinement – sites where individuals are present in close proximity for a fixed duration, not merely sites that a large number of people briefly pass through over the course of a year. *Antonyuk*, 120 F.4th at 1019-21. The district court acknowledged as much, observing that post offices "do not confine individuals as tightly as a subway car or assemble them for a common purpose over a fixed duration like churches or theaters." SPA.19. Having recognized that mismatch, the district court incorrectly substituted sheer transaction volume for *Antonyuk*'s actual organizing principle.

The Office of Inspector General (OIG) report that the district court *sua sponte* imported to supply that volume does not support – and in several key respects, affirmatively contradicts – the district court's conclusions. The OIG report was not a security study. It was a retail analytics study commissioned to help the Postal Service "make better retail decisions and improve customer service, sales, and efficiency," specifically by analyzing whether post offices could increase their

---

[6] The Appellants do not concede that *Antonyuk*'s crowded-place doctrine is correct, but recognize that it continues to bind panels of this Court in cases involving state laws. *See generally Christian v. James*, 176 F.4th 189 (2d Cir. 2026).

30

commercial "conversion rate" – the percentage of visitors who make a purchase. App.575, 588. Its purpose never intersects with crowd-based security doctrine, and nothing in it purports to measure the kind of crowd density or sustained congregation that *Antonyuk* requires.

More critically, the report's own data shows that aggregate annual visitor counts measure something categorically different from the confinement and sustained congregation *Antonyuk* describes. Of the OIG's estimated 2.7 billion annual visits for Fiscal Year 2016, it also estimated that 1.8 billion – approximately two-thirds – consist of Post Office Box visits. App.594. Additionally, the report specifically notes that "many post office visits last less than a minute." App.579, n.10. A person entering a 24-hour lobby alone to spend 45 seconds checking a post office box and leaving is the antithesis of the confinement and sustained co-presence that, under *Antonyuk*, distinguishes "quintessentially crowded" public places from non-sensitive places. An aggregate annual headcount built from the OIG study's estimates does not distinguish between a person who spends 45 seconds checking a post office box at midnight and a person who waits thirty minutes in line at a service counter during a rush hour. The district court's "200 visitor per day" figure is built entirely from that aggregate. It merely measures how many people passed through post office doors over the course of a year. It says nothing about how many were

31

present at any one time, in what proximity, or for how long – the central metrics of what *Antonyuk* requires.

The OIG report's own segmentation further undermines the district court's reasoning. It explicitly divides the United States Post Office network into four tiers: approximately 450 "Mega" locations with roughly 10,105 weekly visits; 7,000 "Large" locations with roughly 4,095 weekly visits; 8,000 "Small/Medium" locations with roughly 1,599 weekly visits, and 15,378 "Micro" locations – comprising approximately half of all post offices in the country – with approximately 428 weekly visits, or roughly 61 per day. App.583-84. The district court's nationwide average of "200 per day" is mathematical gamesmanship generated by spreading Mega-location traffic across the entire post office network. 18 U.S.C. § 930(a), however, does not operate as an average. It applies categorically to every post office in the country, including the 15,378 Micro locations where no reasonable application of *Antonyuk*'s crowded-place doctrine would find its central premises satisfied.

*Bruen* cautioned courts not to expand "sensitive places" doctrine in a way that eviscerates "the general right to publicly carry arms for self-defense" based on crowding in that place. 597 U.S. at 30-31. The district court committed that precise error here. Nastri frequents one post office that looks similar to a bank branch. App.107. Nothing in the record establishes that it is a Mega or Large location.

32

Nothing in the record establishes any raw numbers as to its foot traffic. Nothing in the record establishes the characteristics of any congregation within its walls. The burden was on the United States to supply that information, and it chose not to. Likewise, even though it was not their burden, the Appellants provided evidence of how Post Offices fit into their communities, sitting next to retail stores and restaurants. App.107-112, 122-171. Nonetheless, the district court expanded "sensitive places" doctrine based on a crowding theory to locations for which there is no evidence that they meet the standard and for which there is plenty of evidence that they do not.

The OIG report's own retail comparators confirm this point. The report analogizes Mega post offices to Best Buy stores and Large post offices to CVS pharmacies – explicitly commercial benchmarks for a retail strategy analysis. App.583-84. If the district court's reasoning is correct, Best Buy and CVS are also "quintessentially crowded places" in which the government may categorically suspend the Second Amendment right to keep and bear arms for self-defense. The United States, however, did not argue this, and the Supreme Court has rejected government attempts to categorically prohibit the bearing of firearms in "retail establishments that residents of cities and suburbs frequent as part of their daily routines." *Wolford v. Lopez*, 2026 WL 1825723, at *13 (U.S. S.CT. June 25, 2026).

33

*Wolford* also rejected another aspect of the district court's approach – recharacterizing *Antonyuk*'s confinement-and-congregation principle as a raw visitor-count test and then applying a misread retail analytics study to supply the numbers.

*Wolford* considered a Hawaii law that prohibited the bearing of firearms "on private property without the express and affirmative consent of the property owner." *Id*. at *3. Hawaii compared this law to historical game laws that prohibited unauthorized hunting on private property. *Id*. at *12-13 (discussing Hawaii's historical laws). The Ninth Circuit upheld Hawaii's law based on these analogues because it found that "the Nation has an established tradition of arranging the default rules that apply specifically to the carrying of firearms onto private property." *Wolford v. Lopez*, 116 F.4th 959, 995 (9th Cir. 2024).

The Supreme Court rejected this reasoning. First, at the threshold textual inquiry, *Wolford* refused to allow Hawaii – or the Ninth Circuit – to re-characterize a firearms restriction as a neutral default rule of property law, holding that the shift from the common-law implied-license rule "unquestionably imposed a new and significant burden on the exercise of the right that this Court recognized in *Bruen*," regardless of how that burden was labeled. *Wolford*, 2026 WL 1825723, at *9. Second, at the step-two historical inquiry, the Supreme Court rejected the Ninth Circuit's historical characterization. It assumed, "[f]or the sake of argument…, that

34

[Hawaii's] analogues were well known and accepted." *Id*. at *12 n.15. It, however, concluded that "they [were] far too different from Hawaii's default rule to permit us to infer that the default rule is consistent with the codified Second Amendment right." *Id*. at *12 n.15. Even crediting Hawaii's proffered historical laws fully and at their broadest possible scope, *Wolford* rejected the Ninth Circuit's re-characterization of those laws at a level of generality so far removed from their actual animating purpose that the characterization became a modern judicial invention disguised as a historical inquiry.

The district court made similar, impermissible errors here. First, it re-characterized *Antonyuk*'s confinement-and-sustained-congregation doctrine as a raw foot-traffic test – the same kind of historical reimagination that *Wolford* rejected. SPA.18. Second, even assuming *arguendo* that the district court's foot-traffic figures and its architectural narrative are factually correct and reliable – the gap between *Antonyuk*'s crowded-place tradition and a modern post office lobby remains too wide. *Antonyuk* found its tradition based on sustained crowd confinement in places of public assembly. No amount of annual traffic converts a brief transactional establishment into a place of sustained public assembly such as the theaters or banquet halls *Antonyuk* identified. *Antonyuk*, 120 F.4th at 1032-39. *Wolford* forecloses both the reimagination and the result it was designed to produce: a

35

sensitive-places doctrine for ordinary interpersonal interactions that *Bruen* warned cannot become the rule rather than the exception. *Bruen*, 597 U.S. at 30-31.

> **(b)** **The district court's foot-traffic finding independently fails because the OIG report cannot be judicially noticed for the proposition the district court drew from it, and the "200 per day" figure is not a judicially noticeable fact at all.**

Independent of its substantive errors pertaining to the OIG report, the district court exceeded its authority to judicially notice facts. Fed. R. Evid. 201(b)(2) limits judicial notice to facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The OIG report fails this standard.

The OIG report characterizes its 2.7 billion visit figure as the product of a model built on data, survey-based estimates, and "assumptions about how those figures translate into foot traffic." App.575. A proposition derived from acknowledged assumptions is definitionally one that can be reasonably questioned. The OIG report itself confirms this by presenting four competing methodologies producing visit estimates spanning nearly a tenfold range: 1.3 billion (smartphone location data), 2.7 billion (OIG model), 4.5 – 5.9 billion (USPS Household Diary Survey), and 4.8 – 8.1 billion (OIG survey). App.579-80. A factual proposition with a plausible range from 1.3 to 8.1 billion visits is not beyond reasonable dispute. Indeed, the Appellants' briefing demonstrates the point. Using the Post Office's 2023 statistics, they calculated approximately 70 visitors per post office per day,

36

while the district court reached a different calculation of 200. SPA.18-19. Data that permits reasonable competing calculations from the same source cannot satisfy Rule 201(b)(2).

The specific figure the district court actually used – "approximately 200 visitors per day" – presents an independent problem. SPA.18-19. It does not appear anywhere in the OIG report or in any Post Office publication. It is the district court's own arithmetic: approximately 655 million (2024 official visits) multiplied by the OIG's 2017 tripling factor, divided by the number of post offices and by the number of days Post Offices are open. SPA.18-19. Fed. R. Evid. 201 allows a court to notice indisputable facts from sources. They, however, do not permit courts to create their own opinion-based evidence by combining figures and untested assumptions that no party presented and then treat the result as a judicially noticeable fact. What the district court judicially noticed was a contested fact. Its approach violates the party-presentation rule, and the Court should conduct its analysis without regard to the OIG study. *See United States v. Sineneng-Smith*, 590 U.S. 371 (2020) (holding that courts violate the party-presentation principle when they inject arguments that counseled parties have not raised and resolve cases on that basis).

The OIG study itself cautioned against the specific extrapolation the district court performed: "Since this was *not* a nationally-representative sample, the OIG did not attempt to extrapolate the foot traffic from these locations to nationwide foot

37

traffic." App.581. The people-counter validation underlying the tripling assumption was conducted at thirty-two of the "highest traffic" post offices in Northern Virginia, and it was deliberately limited because a nationally representative sample was "logistically unworkable." App.596. A source that cautions against a specific application and relies on untested assumptions cannot be a source "whose accuracy cannot reasonably be questioned" when put to that very application.

Finally, even if these statistics were properly noticeable, Rule 201(e) entitles a party, on timely request, to be heard on the propriety of taking judicial notice and the nature of the matter noticed. When a court takes judicial notice *sua sponte* and discloses the noticed material for the first time in a dispositive ruling that mandates a final judgment, that right is rendered hollow. This is particularly true in this case because, even if the Appellants had moved for reconsideration, the outcome would not have changed as the district court also rested its decision on its general conclusions about post offices' architecture and status as government buildings. SPA.17, 20. Accordingly, the Appellants had no meaningful opportunity to challenge the OIG's report's methodology or contest its application or weight as they have done in this brief.

This procedural deficiency confirms what the substantive analysis already establishes: the United States never carried its burden. The burden was the United States' responsibility to meet through evidence that it properly presented, not

38

evidence that the district court presented on its behalf. The United States never presented the OIG report, did not ask it to be judicially noticed, and did not give the Appellants any opportunity to contest its methodology, limitations, or the extrapolations the district court performed. Because the foot-traffic predicate underlying the district court's crowded-place holding rests entirely on evidence the United States never presented and a calculation the district court never should have performed, this Court should reverse the district court's decision. Moreover, a remand is not an appropriate remedy because the United States' failure to present the evidence and the district court's error does not justify giving the United States a second bite at the apple to present evidence it chose not to offer the first time.

What remains is a complete lack of a well-established and representative historical analogue addressing "how" and "why" restricting firearms in post offices is constitutionally permissible. The district court's two efforts to bridge that gap – reconstructing Founding-era postal architecture and recharacterizing the crowded-place doctrine through a misapplied retail analytics study – are both the kind of judicial imaginations that *Bruen*, *Hemani*, and *Wolford* foreclose. Accordingly, the United States has failed to carry its burden even under the more lenient nuanced approach.

39

**E.** **The United States' "sensitive places" analogues independently fail because the animating purpose of restricting firearms before governmental officials conducting deliberative proceedings does not remotely resemble a post office.**

Even setting aside the crowded-place doctrine and its infirmities, the district court credited a second, independent theory – that post offices fall within a "longstanding regulatory approach" of restricting firearms in "designated sensitive locations, including public assemblies, polling places, and buildings where government business was conducted." SPA.21. That conclusion is also wrong. The United States' historical record on this theory consists of laws that the district court absorbed into a phrase – "buildings where government business was conducted" – at a level of generality so far above the actual laws that the district court's framing did the historical work rather than the laws themselves. Under *Hemani*'s "how" and "why" framework and *Wolford*'s prohibition on such recharacterizations, the district court's decision is plainly reversible error.

The United States relied primarily on seven laws that dated from 1313 to 1835 and *Antonyuk*'s laws generally. App.357-58. None of these laws are analogous to 18 U.S.C. § 930(a)'s categorical post office ban.

**1. Legislative assemblies:**

The United States cited a 1313 law prohibiting "force and armour" in Parliament, *see* 7 Edw. 2, 170 (1313), and the Statute of Northampton, which prohibited carrying of arms before judges and government ministers. App.357. None

40

of these laws applied to all government officials or buildings. Instead, they applied to deliberative operations of the English government: Parliament, judges, and executive officials.

The "why" of both laws is the same, and *Bruen* established it: the Statute of Northampton was a direct reaction to "the tendency to turmoil and rebellion" and "a more general spirit of insubordination" that "was everywhere apparent throughout the realm." *Bruen*, 597 U.S. at 41 (cleaned up). The animating concern was the threat that armed men would intimidate, coerce, override, or otherwise pervert the deliberative and adjudicative processes on which legitimate governance depended. Parliament could not deliberate freely under the threat of armed violence. The English Crown's justices could not render impartial judgments if subject to the threat of armed coercion. The "why," in short, was protecting the integrity of specific deliberative acts of government – legislative and judicial deliberation, adjudication, and the administration of official duties that required deliberative policy judgment – from the distorting influence of armed force.

The "how" reflects this purpose precisely. The 1313 Parliament law applied only to those who "appear in Parliament" – *i.e.,* participants or spectators. It was a proceeding-specific restriction, not a building-specific one. The Statute of Northampton applied "before the King's Justices" and "other of the King's ministers doing their office." 2 Edw. 3, c. 3 (1328). The operative phrase is "doing their

41

office:" the restriction attached to the official deliberative act, not to the person or location. A justice who was not sitting, a minister who was not performing his duties, was not within the law's reach. The restriction expired the moment the official deliberative act ceased.

The same structure carried into the colonial context under the United States' own laws. App.357-58 (citing 1647 Md. Laws 216 and 1650 Md. Laws 273). Maryland's 1647 and 1650 laws – cited by the United States – only prohibited firearms carriage in the House of Assembly during its session. 1647 Md. Laws 216; 1650 Md. Laws 273. The session limitation operated as a temporal limit – the same building, between legislative sessions, was unrestricted by the laws' plain text. The United States produced no colonial laws that prohibited carrying arms in or around any government facility outside of legislative assemblies while they were in session.

Similarly, *Antonyuk*'s citation of the 1786 Virginia version of the Statute of Northampton conditioned the prohibition on carrying arms before judges or ministers on them doing their office. *See* 1786 Va. Acts 33, ch. 21.

Neither the "how" nor the "why" of any of these laws has any relationship to a post office. No deliberative process occurs at a post office. No adjudication. No official deliberative act of self-government whose integrity could be threatened by an armed citizenry. Postal employees processing packages are not performing judicial activities or other acts of a high-ranking, policy-making federal official.

42

Moreover, postmasters were government employees in the Founding-era, and post offices operated contemporaneously with these laws. The Founders, however, enacted no laws to cover postal facilities. That historical silence does not reflect unawareness of the challenges posed by separate architecture or crowding. Instead, it was an affirmative historical choice to limit these restrictions to deliberative acts of self-government that actually required protection from armed coercion.

18 U.S.C. § 930(a) shares neither the "how" nor the "why" of this tradition. Its prohibition is permanent, categorical, and building-specific. It applies at 3:00 AM in an unstaffed 24-hour post office lobby whether or not any government act is occurring, any official is present, or any proceeding is underway. *Hemani* requires a close fit between the mechanism and purpose of the historical law and the modern statute. *Hemani*, 146 S.Ct. at 1687-89. That fit is absent here: event-specific restrictions protecting acts of deliberative self-government cannot justify a permanent facility ban at a post office where no deliberation occurs.

### 2. Polling places:

The United States then turned to 1776 and 1787[7] laws from Delaware and New York – Del. Const. Art. 28 (1776) and Act of Jan. 26, 1787 N.Y. Laws 345 – which it argued prohibited bringing arms to a polling place during an election.

---

[7] Below, the United States argued that this law was from 1778 but did not provide a copy of it. App.358. Its citation, however, indicated that the law was from 1787. App.358.

43

App.358. Those laws affirmatively undermine rather support the United States' position.

First, the 1787 New York law does not support the United States' claim that it prohibited bringing arms to polling places during elections. App.358. The actual text of the law reads: "That all elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election upon pain of fine and imprisonment and treble damages to the party grieved." Act of Jan. 26, 1787 N.Y. Laws 345.[8] Nothing in this law prohibits the bearing of arms at polling places or near election sites at all. Instead, it is a conduct-based law that prohibits interfering by force with the right to vote on the pain of criminal and civil penalties.

If anything, the 1787 New York law confirms the Founders' understanding of the appropriate mechanism for protecting elections from armed coercion: prohibit the harmful conduct – interference with electoral decisions by force – rather than designating a class of locations as permanently arms-free. That is precisely the opposite of 18 U.S.C. § 930(a)'s approach. Accordingly, the 1787 New York law does not provide the close match that *Hemani* requires in both "how" and "why." 146 S.Ct. at 1687-89.

---

[8] Retrieved from https://history.nycourts.gov/nys-bill-rights-1787/ (last checked July 10, 2026).

Second, the Delaware Constitution was explicit about both its purpose and the limitations on its scope. Del. Const. Art. 28 (1776) provided:

> To prevent any violence or force being used at the said elections, no person shall come armed to any of them, and no muster of the militia shall be made on that day; nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter, who offers to vote, objects thereto; nor shall any battalion or company, in the pay of the continent, or of this or any other State, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively, for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed, so as in any manner to impede the freely and conveniently carying on the said election: Provided always, That every elector may, in a peaceable and orderly manner, give in his vote on the said day of election.

The stated "why" is preventing armed interference or coercion of the electoral act itself – not securing a specific building, not protecting government operations generally, and certainly not any purpose that has any relationship to mailing a letter. The "how" is equally specific and limited: the prohibition applied only on election day for a specific and very short time period. The entire restriction expired with the election. Unlike 18 U.S.C. § 930(a)'s categorical, permanent prohibition, this was an event-specific restriction that protected a specific, deliberative act of self-government for its duration and no longer.

Most tellingly, the Founders did not connect these laws to government buildings because elections were not held in government buildings. Founding-era polling places were typically taverns, private homes, churches, and general stores –

45

the same ordinary commercial and private establishments where people conducted everyday business the other 364 days of the year. *See* Museum of the American Revolution, *How Did They Vote?*[9] (noting New Jersey polling places were "often a prominent tavern"); Dunham Tavern Museum, *Old Fashioned Elections*[10] ("Unlike today, polling places tended not to be located at schools and churches, but at other public buildings. The most surprising of these to a modern voter would be the Tavern."); Early American Elections Project, *Electing Members of Congress in the Early Republic*[11] (noting that in southern states, voting took place "at the county court house, and for those counties with large populations, also in taverns, churches and general stores"). When the election ended, the tavern reverted to being an ordinary commercial space. The firearms restriction followed the deliberative act of self-government, not the building. That is precisely the opposite of the United States' theory that "government business" is what triggers a sensitive-place designation – and it is precisely consistent with the Founders' simultaneous silence on post offices, where no such deliberative act of self-government occurred.

---

[9] Retrieved from https://www.amrevmuseum.org/virtualexhibits/when-women-lost-the-vote-a-revolutionary-story/pages/how-did-they-vote (last checked July 10, 2026).

[10] Retrieved from https://www.dunhamtavern.org/blog-3-1/old-fashioned-elections (last checked July 10, 2026).

[11] Retrieved from https://earlyamericanelections.org/essays/03-lampi-election-methods.html (last checked July 10, 2026).

### 3. Municipal discharge ordinance:

The United States' final law was an 1835 municipal ordinance from Providence, Rhode Island that prohibited the *firing*, not *the carriage or possession*, of firearms on any public lands within the city. App.358 (citing The Charter and Ordinances of the City of Providence with the Acts of the General Assembly Relating to the City, Page 60, Image 61 (1835)). This ordinance falls far short of carrying the United States' burden.

First, even assuming that it is somehow relevant, it is a single municipal ordinance that does not even address the right to carry for self-defense. A single city's discharge prohibition cannot supply the well-established and representative historical analogue that the Supreme Court has repeatedly required, let alone a historical foundation for a categorical, nationwide, permanent ban on the exercise of Second Amendment rights in every one of the country's 30,000+ post offices. *Bruen*, 597 U.S. at 30.

Second, the ordinance fails in the "how" analysis. It only prohibits discharge – the act of firing – not carriage or possession on public lands. A law regulating what a person may do with a firearm is categorically different from a law designating a location where a person may not carry one. The "how" has nothing in common with 18 U.S.C. § 930(a)'s prohibition on mere possession: a person who entered Providence public land carrying a firearm violated no laws. A person who enters a

47

United States Post office with a holstered, unfired firearm faces federal criminal prosecution. This is a far departure from *Hemani*'s requirement of a close fit in how the two laws operate. 146 S.Ct. at 1687-89.

**4. The district court's re-characterization of these laws at an artificial level of generality violates *Wolford*'s clear command, and the United States' own conduct confirms it.**

The district court did not find that any of the government's historical laws were specifically analogous to post offices – because none of them are. Instead, it found that those laws, abstracted to the level of any building "where government business was conducted" encompass post offices as a subcategory of that general description. SPA.20-21. That is precisely the re-leveling at a higher level of generality that *Wolford* foreclosed.

As discussed in Section I.D.2(a), *Wolford* rejected Hawaii's effort to recharacterize anti-poaching laws – which prohibited unauthorized hunting on private property – to the level of default rules about the carrying of firearms onto private property, which, in turn, would justify Hawaii's law requiring affirmative and explicit permission to bear arms on private property. *Wolford*, 2026 WL 1825723 at *12 n.15. Hawaii's effort was facially plausible: anti-poaching laws did regulate who could bring firearms onto someone else's private property. *Id*. at *12-13 (discussing laws). The Supreme Court, however, held that it must look to the historical laws' actual animating purpose – preventing the specific harms of

48

unauthorized hunting. *Id*. The Supreme Court found those purposes bore no relationship to Hawaii's law, which regulated lawful concealed carry that "[o]thers on the premises will not even notice…." *Id*. at \*13. Re-leveling the historical purposes until a categorical fit appeared was not analogical reasoning. It was substituting modern interest-balancing for a historical tradition.

The district court here committed the same error in a more extreme form. The laws proffered by the federal government in this case all fit within the historical tradition of protecting deliberative proceedings. The entire historical record of legislative, judicial, and electoral restrictions the federal government produced consists of laws protecting specific deliberative acts of self-government during their occurrence. The actual animating purpose – preventing armed coercion of deliberative proceedings of self-government – is narrower, not broader, than anti-poaching laws, and even the crowded-places tradition *Antonyuk* found. Not a single law proffered in this case operates as a general rule about the class of places where the government conducts any business. Yet the district court re-leveled that narrow, proceeding-specific tradition to a categorical principle that prohibits peaceful, law-abiding carry of arms[12] for self-defense in all "buildings where government business was conducted." *Wolford* teaches that this is not historical analysis. It is the invention

---

[12] Like Hawaii in *Wolford*, the only lawful way for most people to publicly carry a firearm for self-defense in Connecticut is to conceal it. Conn. Gen. Stat. § 29-35(a)(2)

49

of a principle that the historical record does not support and the application of that invented principle to a context the actual laws never contemplated.

The constitutional question, as mandated by *Wolford*, is not whether post offices can be described as buildings where government business is conducted. It is whether the historical laws restricting firearms in deliberative proceedings of self-government impose a burden on the right to bear arms that is "relevantly similar" to 18 U.S.C. § 930(a)'s categorical prohibition on lawfully carrying them in post offices. *Id*. at *13. They do not – not in "how," not in "why," and not in any feature that matters to the analogical inquiry.

The federal government's own conduct settles any remaining doubt. When the federal government holds a deliberative proceeding, the government behaves like it is a "sensitive place:" *i.e.*, weapons screening at courthouse entrances and in legislative galleries and armed security in both venues. These are the operational markers of locations that the government itself treats as sensitive – and they are conspicuously absent from every post office in the country. As the Appellants' record demonstrates, the federal government often posts no required signage announcing the firearms prohibition, provides no security, employs no weapons screening, and physically locates the facility in the same building as pizza restaurants, salons, and convenience stores where no firearms restriction applies. App.107-110, 122-171. The federal government's own operational choices reveal

50

what its historical argument conceals: it does not treat post offices like "sensitive places" because they are not "sensitive places" in any sense the historical tradition contemplated, and they never have been. A government that does not secure post offices, warn visitors of the prohibition, or distinguish them operationally from adjacent retail establishments has no basis to invoke the sensitive-place tradition as historical justification for a criminal ban within them.

Because the "why" of the historical laws proffered by the United States – preventing armed intimidation of deliberative governmental proceedings – has no relationship to a postal counter, and because the "how" of that tradition – proceeding-specific restrictions bounded by the duration of the deliberative acts – bears no resemblance to 18 U.S.C. § 930(a)'s categorical, all-times prohibition on post offices, the United States' historical analogues fail the historical test required by *Bruen*, *Hemani*, and *Wolford*. Accordingly, this Court should reverse the district court's grant of summary judgment to the Appellees and its denial of summary judgment to the Appellants.

### F. **Even if the historical record were genuinely ambiguous, historical ambiguity does not satisfy the United States' burden under *Bruen*.**

*Bruen*'s footnote 11 contains a neglected instruction about Second Amendment historical analysis: once a plaintiff has demonstrated that the Second Amendment's plain text protects his conduct, historical ambiguities and uncertainties must be construed against the government, not in its favor. This rule

51

carries particular weight where there is more than one plausible reading of a historical statute or case. While the Appellants contend that the historical record unambiguously favors them in this case, the best that the United States can muster is an argument that breeds historical ambiguity. Accordingly, it has failed to satisfy its burden under *Bruen*.

*Bruen*'s footnote 11 responded to the dissent's criticism of the Court's treatment of *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686). The Court had interpreted that case and the Statute of Northampton as prohibiting only conduct that would cause an "affray" or a "breach of peace." *Bruen*, 597 U.S. at 43-44. The dissent contended that *Sir John Knight's Case* did not support the "affray" or "breach of peace" interpretation. *Id*. at 44 n.11. The Court acknowledged that there could be "multiple plausible interpretations of *Sir John Knight's Case*," but held that it would "favor the one that is more consistent with the Second Amendment's command." *Id*. at 44, n.11. The Court explained that this approach was required "because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope." *Id*. at 44, n.11.

This is not a singular treatment of a specific piece of historical evidence. *Bruen* plainly connected its treatment of *Sir John Knight's Case* to the general

52

burden-of-proof rule it had previously announced: the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. The government may not take refuge in historical ambiguity and receive a construction of that ambiguity in its favor and against the Second Amendment's presumptive protections. Historical uncertainty is not a draw where courts get to pick the winner they prefer – it is evidence that the government has not carried its burden.

*Bruen*'s treatment of constitutional liquidation reinforces this rule. The Court acknowledged that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id*. at 36 (cleaned up). "But to the extent later history contradicts what the text says, the text controls. [L]iquidating indeterminacies in written laws is far removed from expanding or altering them." *Id*. at 36 (cleaned up). Taken together, these instructions do not permit the government to carry its historical burden by inviting courts to select, from among multiple plausible interpretations of historical laws or cases, the one that justifies a broader restriction on Second Amendment rights. Instead, *Bruen* requires the government to produce clear and unambiguous historical evidence.

53

These principles led *Bruen* to discount much of the "English history and custom before the founding" as "ambiguous at best:" *Id*. at 39-40. The instruction is plain: ambiguous history does not discharge the government's burden.

This rule directly applies here in three ways.

First, the United States's historical record consists of seven laws – from a 1313 Parliamentary restriction to an 1835 municipal discharge ordinance – none of which applies to post offices or to any facility engaged in government mail service rather than deliberative proceedings of self-government. App.357-358. To the extent any ambiguity exists about the reach of those laws – whether "doing their office" extends beyond adjudicatory or policy-making officials, whether "during session" implies anything about other government facilities, whether the 1787 New York law is a location-based restriction or a conduct-based prohibition – *Bruen*'s footnote 11 requires any ambiguity to be resolved in the Appellants' favor. On each of those questions, the narrower reading is not only plausible, but the texts of the laws also better support it. The Maryland laws' plain text says "while the howse is sett" – a session limitation, not a facility limitation. 1647 Md. Laws 216; *see also* 1650 Md. Laws 273 (revising the language to reflect a bicameral legislature). The Virginia law and Statute of Northampton say "doing their office" – a function limitation, not a building limitation. 1786 Va. Acts 33, ch. 21; 2 Edw. 3, c. 3 (1328). The 1787 New York law did not ban arms at polling places at all – it merely prohibited interference

54

by force with the right to vote, a conduct restriction that carries no implication about where firearms may be carried. Act of Jan. 26, 1787 N.Y. Laws 345. The 1776 Delaware Constitution limited its prohibition to polling places on Election Day. Del. Const. Art. 28 (1776). Accordingly, whatever interpretation the United States advances for any of these laws, that interpretation will not be clear and unambiguous in its favor. Instead, the Appellants' interpretations are more consistent with the Second Amendment's textual protections for the right to keep and bear arms, and carry the day.

Second, even if the United States' reliance on *Antonyuk* is not misplaced for the reasons explained above, *Antonyuk*'s crowded-places tradition also contained substantial historical ambiguities. King Edward III – the king who oversaw the enactment of the Statute of Northampton in 1328 – twice wrote to English officials instructing them on how to enforce it and making clear that it applied to affrays and breaches of peace. *See* Stephen Halbrook*, The Right to Bear Arms: A Constitutional Right of The People Or A Privilege Of The Ruling Class,* pp. 28-29 (Bombardier Books 2021) (quoting 1 Calendar of the Close Rolls, Edward III, 1327-1330 at 420 (Nov. 10 and 11, 1328) (H.C. Maxwell-Lyte ed., 1896); Letter to Keeper and Justices of Northumberland (Oct. 28, 1332), in 2 H. Maxwell-Lyte ed., *Calendar of the Close Rolls, Edward III*, *1330-1333*, at 610 (London: Her Majesty's Stationery Office, 1898). English jurists and commentators consistently explained the common

55

understanding that limited the Statute of Northampton to conduct-based offenses.[13] English courts consistently applied the Statute of Northampton only to conduct-based offenses without regard to crowding. *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (KB) (1686); *Rex v. Dewhurst*, 1 State Trials, N.S. 529, 602 (1820) (recognizing that arms could be carried to a public meeting as long as they were not calculated to create terror and alarm).

*Antonyuk* acknowledged ambiguities in the historical record when, embracing the locational view of English history, it noted that "the Virginia statute differed from the medieval English Northampton statute in that it prohibited *conduct* and not simply carriage, *i.e.*, bearing arms in 'terror' of the county…." *Antonyuk*, 120 F.4th at 1020 n.82.

Beyond *Antonyuk*'s acknowledged ambiguity, even if the Court does not accept the Appellants' strong showing that Francois Martin's North Carolina compilation was never actual law, the North Carolina Supreme Court created substantial ambiguity over *Antonyuk*'s contention that the national tradition evolved

---

[13] Sir Edward Coke, *Institutes of the Lawes of England*, 1628 (3 Inst. 158); Richard Burn, *The Justice of the Peace and Parish Officer*, pp. 17-18 (16th ed. 1788); Richard Wingate, *An Exact Abridgment of all Statutes in Force and Use From the Beginning of Magna Charta, until 1641*, p. 23 (1684); Serjeant William Hawkins, 1 *A Treatise of Pleas of the Crown, or a System of the Principal Matters relating to that Subject, Digest Under Proper Heads*, p. 136 (1716); Michael Dalton, *The Country Justice*, p.7 (1690); John Bond, *A Compleat Guide for Justices of the Peace* (Bond, 3rd ed. 1707).

toward location-based restrictions beginning in the Founding-era. *State v. Langford*, 10 N.C. (3 Hawks) 381 (1824) and *State v. Huntly*, 25 N.C. (3 Ired.) 418, 418-19 (1843) squarely rejected any suggestion that North Carolina law imposed anything more than a conduct-based regulation. North Carolina law is, thus, ambiguous, and *Bruen* requires it to be construed in the Appellants' favor.

Accordingly, nothing in *Antonyuk* clearly and unambiguously establishes a location-based restriction that can reach post offices.

Third, even ignoring any foundational ambiguities in historical sources, whether any tradition derived from those sources extends to post offices is, at best, ambiguous. The district court acknowledged that no such location-based restrictions extended to post offices until 1972 – far too late in time to supply the necessary historical tradition. SPA.16. Its answer, however, did not come from clear and unambiguous historical evidence, but rather judicially improvised architectural and foot-traffic narratives. SPA.16-21. An undemonstrated and, at best, ambiguous historical tradition does not meet the government's burden under *Bruen*'s footnote 11.

The district court, however, failed to apply this rule. Faced with a historical record that admits of narrower, plausible readings at every turn – conduct-based statutes that could be read as location-based, session limitations that could be read as building designations, and an uncertain tradition regarding deliberative

57

government officials that could be plausibly read to, *and historically did*, stop well short of post offices – the district court resolved every ambiguity in the government's favor through broad interpretations. *Bruen* required the opposite. Because the United States has not identified clear and unambiguous historical evidence establishing a tradition of restricting firearms in post offices, the Court should reverse.

## II. The Court Should Reverse The District Court's Decision And Remand This Case For It To Determine The Proper Scope Of A Permanent Injunction And To Award Costs And Attorneys' Fees As Appropriate.

### A. Standard of review.

The test for permanent injunctive relief is well-established:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.* "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible

58

decisions." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 99-100 (2d Cir. 2012) (cleaned up).

**B. The United States conceded that a permanent injunction is the appropriate remedy if the Court agrees that the Appellants demonstrate actual success on the merits.**

If the Court determines that 18 U.S.C. § 930(a) violates the Second Amendment as applied to post offices, then the only remaining issue is the appropriate scope of injunctive relief because the United States conceded that injunctive relief is appropriate if the Appellants prevail on the merits. App.364 ("Defendants acknowledge that injunctive relief is typically appropriate to redress the prospect of unconstitutional prosecution"). The United States only asked for supplemental briefing on the scope of the injunction. App.364. Because it concluded that the Appellants did not succeed on the merits, the district court never reached the question as to the scope of a permanent injunction. SPA.1-27.

Accordingly, a remand is appropriate for the district court to determine the scope of a permanent injunction if the Court reverses on the merits.

**C. Any remand should be narrow and limited to the determination of the scope of a permanent injunction, costs, and attorneys' fees.**

The Court should direct the district court to enter summary judgment in favor of the Appellants and limit any remand in this matter to the determination of the scope of a permanent injunction, costs, and attorneys' fees because this case presents a pure question of constitutional law on an undisputed factual record.

59

As set forth in Section I, the Appellants have demonstrated actual success on the merits. Irreparable harm follows directly: the deprivation of a constitutional right, even for minimal periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Appellant Nastri carries a firearm for self-defense as a matter of daily practice and must disarm himself before entering his post office – a constitutional harm that recurs every time he visits. App.106. All members of WTP, who similarly visit post offices while bearing arms for self-defense, must do so as well or risk arrest. Lastly, the balance of the hardships and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court has recognized that the government, and by extension, the public do not have an interest in enforcing an unconstitutional law. *New York Progress and Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Accordingly, if the Court finds that 18 U.S.C. § 930(a), as applied to post offices, is unconstitutional, it is in the public interest to enjoin its enforcement permanently.

Lastly, the Appellants recognize that the United States has raised objections to the scope of any permanent injunction that the district court never reached: whether Appellant WTP' membership may include persons disqualified from the Second Amendment's protection, and whether certain post office facilities that are located within independently sensitive locations – such as those situated within military installations or federal courthouses – should be excluded from the injunction

60

on grounds not presented in this case. App.364-65. To be clear, the Appellants do not seek a permanent injunction as to any state or federal law other than 18 U.S.C. § 930(a). The United States would be free to enforce other applicable firearms laws, including the prohibition on possession by convicted felons, against any WTP member who falls within their reach. As for post offices located within independently "sensitive places," they present fact-intensive issues, which are a proper subject for briefing on remand.

Accordingly, the Court should reverse the district court's grant of summary judgment and its denial of the Appellants' cross-motion for summary judgment, and remand with instructions to enter summary judgment for the Appellants, determine the scope of a permanent injunction consistent with this opinion, and determine costs and attorneys' fees, if any.

## **CONCLUSION**

For the foregoing reasons, the Appellants respectfully request that the Court reverse the district court's grant of summary judgment to the United States and remand with instructions to enter summary judgment for them and for the district court to determine the appropriate scope of a permanent injunction.

Dated: July 13, 2026     *//s// Cameron L. Atkinson*

            Cameron L. Atkinson, Esq.
            ATKINSON LAW, LLC
            122 Litchfield Rd., Ste. 2
            P.O. Box 340
            Harwinton, CT 06791
            Telephone: 203.677.0782
            Email: catkinson@atkinsonlawfirm.com

          *Attorney for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

I hereby certify that:

1.  This brief complies with the type-volume limitation of Local R. 32.1 because it contain 13,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: July 13, 2026

<u>/s/ Cameron L. Atkinson /s/</u>
Cameron L. Atkinson

## CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2026, an electronic copy of the foregoing Brief Of The Plaintiffs-Appellants was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

64