**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 26-0925

Caption [use short title]

Nastri v. Blanche

**Motion for:** Voluntary Dismissal, Summary Vacatur, and Remand Pursuant to United States v. Munsingwear, Inc., 340 U.S. 36 (1950)

Set forth below precise, complete statement of relief sought:

Vacatur of the district court's judgment and remand for dismissal of the underlying case without prejudice under U.S. v. Munsignwear, Inc. 340 U.S. 36(1950); voluntary dismissal of this appeal for mootness

**MOVING PARTY:** David Nastri, We The Patriots USA, Inc.

**OPPOSING PARTY:** Todd Blanche, David Steiner

☒ Plaintiff ☐ Defendant

☒ Appellant/Petitioner ☐ Appellee/Respondent

**MOVING ATTORNEY:** Cameron L. Atkinson

**OPPOSING ATTORNEY:** Kevin B. Soter

[name of attorney, with firm, address, phone number and e-mail]

| Moving Attorney | Opposing Attorney |
|---|---|
| Atkinson Law, LLC | U.S. Dept. of Justice - Civil Division, Appellate Staff |
| 122 Litchfield Rd., PO 340, Harwinton, CT 06791 | 950 Pennsylvania Ave NW, Room 7222, Washington, DC 20530 |
| 203-677-0782, catkinson@atkinsonlawfirm.com | (202) 514-3602, Kevin.B.Soter@usdoj.gov |

Court- Judge/ Agency appealed from: D.Conn. - Hon. Vernon Oliver

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☒ Yes ☐ No (explain):

Opposing counsel's position on motion:
☒ Unopposed ☐ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☐ Yes ☑ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below? ☐ Yes ☐ No

Has this relief been previously sought in this court? ☐ Yes ☐ No

Requested return date and explanation of emergency:

Is the oral argument on motion requested? ☐ Yes ☒ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? ☐ Yes ☒ No If yes, enter date:

**Signature of Moving Attorney:**

Cameron L. Atkinson Digitally signed by Cameron L. Atkinson Date: 2026.09.11 11:01:05 -07'00'

**Date:** 9-11-2026

Service : ☒ Electronic ☐ Other [Attach proof of service]

**Form T-1080** (rev. 10-23)

# 26-0925

**IN UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

DAVID J. NASTRI, ESQ.; WE THE PATRIOTS USA, INC.

*Plaintiffs-Appellants*

v.

TODD BLANCHE, in his official capacity only; DAVID STEINER, in his official capacity only,

*Defendants-Appellees*,

---

On Appeal from the United States District Court for the Connecticut, No. 3:24-cv-00222-VDO

---

**MOTION FOR VOLUNTARY DISMISSAL, SUMMARY VACATUR, AND REMAND FOR DISMISSAL BY THE PLAINTIFFS-APPELLANTS**

---

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
Fax: (203) 672-6551
catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs-Appellants*

September 11, 2026

## MOTION FOR VACATUR AND DISMISSAL BY THE PLAINTIFFS-APPELLANTS

On August 12, 2026, the United States Department of Justice's Office of Legal Counsel released an opinion stating that 18 U.S.C. § 930(a) does not prohibit the carrying of handguns and other arms into post offices for the "paradigmatic lawful purpose" of self-defense. *See* **Exhibit A**, p. 2 (cleaned up). This opinion binds the Executive Branch unless and until it is rescinded by the Attorney General or the Office of Legal Counsel. Accordingly, the United States is no longer enforcing 18 U.S.C. § 930(a) or prosecuting, for the foreseeable future, individuals such as the Plaintiff-Appellant David Nastri and the members of Plaintiff-Appellant We The Patriots USA, Inc. for their lawful carrying of handguns and other arms in post offices.

Further appellate litigation in this case would raise complex issues of mootness in the Plaintiffs-Appellants' pre-enforcement challenge, and further litigation would consume the judiciary and the parties' resources that could be utilized more efficiently for other matters. At the same time, mere dismissal of this appeal and the doctrine of *res judicata* would bar the Plaintiffs-Appellants from ever pursuing a similar Second Amendment challenge if the government ever reverses course. Accordingly, the Plaintiffs-Appellants move for an order under Fed. R. App. 42 dismissing this appeal as moot, vacating the district court's judgment, and remanding for dismissal without prejudice under *United States v. Munsingwear*, *Inc.*,

340 U.S. 36 (1950). *See American Ass'n of University Professors v. U.S. Dept. of Justice*, 175 F.4th 413 (2d Cir. 2026) (accepting that a stipulation for dismissal under Fed. R. App. 42 with a request for vacatur and remand is an appropriate vehicle).

Counsel for the Defendants-Appellees consents to the granting of this motion, the dismissal of the appeal as moot with each side to bear their own costs, the vacatur of the district court's judgment, and the remand for dismissal without prejudice under *Munsingwear*.

## ARGUMENT

*United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950) created an equitable remedy to preserve parties' future legal rights when cases become moot through no fault of the appellants. Where "a civil case becomes moot pending appellate adjudication, the established practice in the federal system is to reverse or vacate the judgment below and remand with a direction to dismiss." *American Ass'n of University Professors v. U.S. Dept. of Justice*, 175 F.4th 413, 416 (2d Cir. 2026) (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 71 (1997) (cleaned up)). "Courts grant vacatur liberally under such circumstances" to clear "the path for future relitigation of the issues between the parties and [to] ensure[] that unreviewable judgments do not spawn any legal consequences." *Id*. at 416 (cleaned up).

"The appropriateness of vacatur in a particular case turns on equitable considerations and the specific conditions and circumstances." *Id*. at 416 (cleaned up). "[I]f an appellate voluntarily acts with the intent of mooting the appeal, vacatur is typically inappropriate." *Id*. at 416-17. If the appeal becomes moot through no fault of the appellant, "the general duty to vacate and dismiss applies." *Id*. at 417 (cleaned up).

Here, the Plaintiffs-Appellants are wholly blameless for the mooting of this appeal, and the regular course of dismissal and vacatur are applicable.

When the Plaintiffs-Appellants first filed this case on February 20, 2024, the federal government was actively litigating criminal prosecutions against individuals accused of carrying firearms in post offices for self-defense. *See, e.g.*, *United States v. Ayala*, 711 F.Supp.3d 1333 (M.D.F.L. Jan. 12, 2024) (finding 18 U.S.C. § 930(a) unconstitutional as applied to the post office carry ban). The federal government appeared in this case and vigorously defended the case before the district court over the course of more than a year until it informed the district court on June 13, 2025 that the federal government might be changing its position and waived its reply brief. *See Nastri v. Bondi*, No. 3:24-cv-00222-VDO, ECF 24 (D.Conn).

Approximately 9 months later, the district court ruled in favor of the federal government, and the Plaintiffs-Appellants appealed about 2 weeks later. *Nastri v. Bondi*, No. 3:24-cv-00222-VDO, ECF 35, 37 (D.Conn). The Plaintiffs-Appellants

then filed an extensive opening merits brief with this Court based on a complete and well-developed record.

While the government was briefing this case, the Department of Justice's Office of Legal Counsel (OLC) issued an opinion on August 12, 2026 stating that 18 U.S.C. § 930(a) does not prohibit the carrying of handguns and other arms into post offices for the "paradigmatic lawful purpose" of self-defense. *See* **Exhibit A**, p. 2 (cleaned up). The opinion reached this conclusion by interpreting 18 U.S.C. § 930's statutory text rather than through a Second Amendment analysis. *See* **Exhibit A** *generally*. It nonetheless implied that the district court's decision in this case was inconsistent with the Supreme Court's Second Amendment jurisprudence. *Id*. at p. 26.

Opinions from the United States Attorney General bind the Executive Branch.[1] 28 U.S. §§ 511-513. The United States Attorney General has long delegated the responsibility of preparing these opinions to the Office of Legal Counsel. 28 C.F.R. § 0.25(a). Accordingly, the August 12, 2026 OLC opinion, effective immediately, binds the Executive Branch and prohibits it from enforcing 18 U.S.C. § 930(a) against the Plaintiffs-Appellants' lawful carrying of firearms in United States Post Offices.

---

[1] *See also* U.S. DOJ, *Memorandum: Best Practices for OLC Legal Advice And Written Opinions* (July 16, 2010), retrieved from: https://www.justice.gov/olc/best-practices-olc-legal-advice-and-written-opinions

The OLC memorandum has eliminated the enforcement of 18 U.S.C. § 930(a) against the Plaintiffs-Appellants that existed when this case started. Accordingly, the case is moot.

The Plaintiffs-Appellants bear no responsibility for causing the mootness. They did not "simply decline[] to pursue [their] appeal unilaterally…." *American Ass'n of University Professors*, 175 F.4th at 417. They vigorously pursued it and were fully prepared to see it through to the U.S. Supreme Court if necessary. The fact that caused the mootness issue in this case is the formal change in the Defendants-Appellees' legal position and that of the federal government more broadly – a fact entirely out of the Plaintiffs-Appellants' ability to control.

Vacatur and remand "harms neither party," and, in fact, protects the Plaintiffs-Appellants. *Id*. at 417 (cleaned up). To the extent that there is any damage to the public interest, it is that the Second Amendment issues may be left to future litigation if the government reverses its position again. *Id*. at 417. The benefits of preventing district courts' orders from becoming unreviewable, however, outweigh that concern. *Id*. at 417.

Accordingly, vacatur and remand for dismissal is appropriate.

Counsel for the Defendants-Appellees consents to the granting of this motion and agrees that all parties shall bear their own costs.

## CONCLUSION

For the foregoing reasons, the Plaintiffs-Appellants respectfully request that the Court vacate the district court's judgment in this case, remand for dismissal without prejudice, and dismiss this appeal with each party to bear their own costs.

Dated: September 11, 2026

*//s// Cameron L. Atkinson*

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contain 1,139 words as determined by the word counting feature of Microsoft Word 2016.
2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: September 11, 2026

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

## CERTIFICATE OF SERVICE

I hereby certify that, on September 11, 2026, an electronic copy of the foregoing was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

# Exhibit A

(Slip Opinion)

# Application of 18 U.S.C. § 930(a) to Post Offices

Section 930(d)(3) of title 18, U.S. Code, permits the lawful carrying of constitutionally protected firearms in post offices that are generally open to the public.

August 12, 2026

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

Congress has passed at least nine different statutes that bar or have been interpreted to bar otherwise law-abiding citizens from carrying weapons into designated locations.[1] It has also empowered the Department of Homeland Security, 40 U.S.C. § 1315(c), as well as individual federal agencies, *see, e.g.*, 39 U.S.C. §§ 401(2), 403(b)(3) (Postal Service),[2] to regulate who may enter the buildings that they own and operate. Many of those agencies have opted to bar weapons from their facilities and grounds either explicitly by regulation[3] or implicitly by closing their facilities to the public.[4]

---

[1] *See* 15 U.S.C. § 1243 (switchblade knives in federal enclaves); *id.* § 1245(a) (ballistic knives in federal enclaves); 18 U.S.C. § 922(q)(2) (school zones); *id.* § 930(a) (federal facilities); *id.* § 930(e) (federal court facilities); *id.* § 1791(a)(1), (d)(1)(A) (prisons); *id.* § 2277 (seized vessels); 40 U.S.C. § 5104(e)(1)(A) (U.S. Capitol Buildings and Grounds); 49 U.S.C. § 46505 (commercial aircraft).

[2] *See also* 10 U.S.C. § 2672 note (military installations); 18 U.S.C. § 1752(a)(1), (b)(1) (buildings that house individuals protected by the Secret Service or designated events); 40 U.S.C. § 6102 (Supreme Court regulations); 42 U.S.C. § 2278a (Nuclear Regulatory Commission installations); 50 U.S.C. § 797 (defense property security regulations); 54 U.S.C. § 104906 (national parks).

[3] *See* 4 C.F.R. § 25.14 (Government Accountability Office); 7 C.F.R. § 500.12(a) (U.S. National Arboretum property); *id.* § 501.12 (U.S. Meat Animal Research Center); *id.* § 502.13 (Beltsville Agriculture Research Center); *id.* § 503.13 (Plum Island Animal Disease Center); 10 C.F.R. § 73.81(c) (nuclear facilities); 14 C.F.R. § 135.119 (aircraft); *id.* § 1204.1003(a)(2) (National Aeronautics and Space Administration); 15 C.F.R. § 265.39 (National Institutes of Standards and Technology); 28 C.F.R. § 541.3 (Bureau of Prisons facilities); 31 C.F.R. § 91.13 (Bureau of the Mint buildings and grounds); *id.* § 407.13 (Treasury building and annex); *id.* § 700.11 (Federal Law Enforcement Training Center); 32 C.F.R. § 228.7 (National Security Agency); *id.* § 234.10 (Pentagon); *id.* § 552.120 (Fort Lewis); *id.* § 1903.10 (Central Intelligence Agency); 33 C.F.R. § 207.20(q)(10) (Cape Cod Canal); 36 C.F.R. § 13.1210 (Katmai National Park); *id.* § 327.13 (water resource development projects); *id.* § 331.3(b) (Ohio National Wildlife Conservation Area); *id.* § 504.14 (Smithsonian Institution premises); *id.* § 520.15 (Na-

You have asked whether one of those restrictions, codified at 18 U.S.C. § 930(a), is best read to impose criminal penalties on an otherwise law-abiding individual who carries weapons into a post office for the purpose of self-defense. We would have significant constitutional concerns if Congress *had* created such a blanket ban on the lawful carrying of constitutionally protected arms into a building frequented by the public since the Founding. But we ultimately need not reach that issue here, as Congress has exempted the "lawful carrying" of firearms or other dangerous weapons "incident to hunting or other lawful purposes." 18 U.S.C. § 930(d)(3). Because carrying arms for self-defense when entering a building held open to the public is a paradigmatic "lawful purpose[]," that exception permits the lawful carrying of constitutionally protected firearms in post offices. *Id.*

## I.

As part its prosecution of the global War on Drugs, Congress made possession of firearms and other dangerous weapons in federal facilities a felony in 1988. *See* Anti-Drug Abuse Amendments Act of 1988, Pub. L. No. 100-690, tit. VI, § 6215(a), 102 Stat. 4312, 4361–62. Congress provided that, subject to three exceptions, "whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so," would be subject to fines, imprisonment of "not more than 1 year, or both." 18 U.S.C. § 930(a). Congress defined "dangerous weapon" to include any "weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a

---

tional Zoological Park); *id.* § 702.7 (Library of Congress); *id.* § 1002.4 (Presidio Trust); *id.* § 1280.14(a) (National Archives and Records Administration); 39 C.F.R. § 232.1(*l*) (U.S. Postal Service property); 44 C.F.R. § 15.15 (certain Federal Emergency Management Agency facilities); 45 C.F.R. § 3.42(g) (National Institutes of Health Federal Enclave); 46 C.F.R. § 386.23 (U.S. Merchant Marine Academy); 49 C.F.R. § 1540.111 (aircraft and secure areas in airports); 50 C.F.R. § 27.41 (National Wildlife Refuge System); Sup. Ct. Bldg. Regul. 3.

[4] *See, e.g.*, U.S. Env't Prot. Agency, *Visiting EPA: Building Access* (July 8, 2026), https://perma.cc/FM5T-DSML; Internal Revenue Serv., *Contact Your Local IRS Office* (July 14, 2026), https://perma.cc/8P94-HKAL; Fed. Bureau of Investigation, *Contact Us: FBI Headquarters*, https://perma.cc/G6RQ-DLFA (last accessed Aug. 3, 2026).

blade of less than [2.5] inches in length," *id.* § 930(g)(2), and a "Federal facility" to include any "building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties," *id.* § 930(g)(1).

A post office is unquestionably a facility within the meaning of section 930. *See, e.g.*, *Nastri v. Bondi*, 828 F. Supp. 3d 316, 330–31 (D. Conn. 2026). The Postal Service is part of the Executive Branch, and its employees are federal employees. *See* 39 U.S.C. §§ 201, 1001. As of fiscal year 2025, the Postal Service owned or leased almost 31,000 retail offices across the United States. *See* U.S. Postal Serv., *Postal Facts: Size and Scope* (2024), https://perma.cc/K7Q5-F9YB. These federally owned or leased offices, where Postal Service employees perform their duties, are federal facilities under the definition of that term in section 930. *See* 18 U.S.C. § 930(g)(1).

Section 930(d) lists three exceptions to the general prohibition against possessing firearms in federal facilities. The prohibition does not apply to:

> (1) the lawful performance of official duties by an officer, agent, or employee of the United States, a state, or a political subdivision thereof, who is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of law;
>
> (2) the possession of a firearm or other dangerous weapon by a federal official or a member of the Armed Forces if such possession is authorized by law; or
>
> (3) the lawful carrying of firearms or other dangerous weapons in a federal facility incident to hunting or other lawful purposes.

*Id.* § 930(d)(1)–(3).

Because your question concerns members of the general public, the third exception, which allows the carrying of a firearm or other dangerous weapon "incident to hunting or other lawful purposes," is most relevant here. *Id.* § 930(d)(3). There has been "very little case law exploring the scope of [the] 'other lawful purposes'" exception. *Yorzinski v. Imbert*, 39 F. Supp. 3d 218, 227 (D. Conn. 2014). When the exception has arisen in litigation, the Department of Justice has argued that "the scope of 'other lawful purpose' is informed by the specific example that the statute provides: hunting." Government's Supplemental Brief to Defendant's Motion

to Dismiss Indictment at 19, *United States v. Ayala*, 711 F. Supp. 3d 1333 (M.D. Fla. 2024), Dkt. 32. And two district courts appear to have agreed that, at minimum, the firearm must be lawfully carried for a "purpose that is related to the federal facility" into which it was carried. *United States v. De la Cruz-Bancroft*, No. 09-cr-319, 2010 WL 8752034, at *2 (D.N.M. Jan. 4, 2010); *cf. Yorzinski*, 39 F. Supp. 3d at 227 (citing favorably *De la Cruz-Bancroft*, 2010 WL 8752034, at *2–3).

## II.

You have asked whether the Department should continue to take a narrow view of the "lawful purposes" exception, allowing the imposition of criminal penalties on otherwise law-abiding individuals who carry weapons into a post office for the purpose of self-defense. It should not.

### A.

To reiterate, section 930(d)(3) provides that section 930(a)'s bar against carrying firearms and dangerous weaponry does not apply to "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes." 18 U.S.C. § 930(d)(3). To fall within this exception with respect to firearms, an individual must satisfy two criteria: (1) the carrying of their firearm must be "lawful"; and (2) the carrying must be "incident to" a "lawful purpose[]," such as "hunting." *Id.*

#### 1.

The first requirement is relatively straightforward. It excludes, for example, a person who is not legally allowed to carry a gun *anywhere*. This requirement considers both state and federal law. *Cf. United States v. Johnson*, 968 F.2d 208, 212 (2d Cir. 1992) (interpreting the term "lawful" in 18 U.S.C. § 1512(d) by its "ordinary meaning" and then considering the interplay between state law and federal law of standards for "lawful conduct" (citation omitted)). Under federal law, this exemption would not cover, for example, a person who has been convicted of a felony or a misdemeanor crime of domestic violence, a person who has been committed to a mental institution, or a person who is in the United States illegally. *See* 18 U.S.C. § 922(g)(1), (4), (5)(A), (9). It may also exclude an

individual who is forbidden from carrying a firearm in the relevant state because he is not licensed—so long as the licensing regime itself is not constitutionally infirm. *Cf. United States v. Tait*, 202 F.3d 1320, 1323–25 (11th Cir. 2000) (finding that the defendant, who was licensed to carry a firearm under Alabama law, did not violate a federal law prohibiting possession of firearms in a school zone).

**2.**

The second requirement is less clear but is best read to cover an individual entering a post office that is open to the public while lawfully carrying a firearm for self-defense. "Incident," used as an adjective, means "occurring or likely to occur esp[ecially] as a minor consequence or accompaniment." *Webster's Ninth New Collegiate Dictionary* 609 (1985).[5] In the legal context, "incident" means "depends upon, appertains to, or follows another." *Black's Law Dictionary* 686 (5th ed. 1979).[6] But section 930(d)(3) does not specify whether the "lawful purpose" to which the carrying of a firearm must accompany is the purpose for entering a federal building or the purpose for carrying the firearm. Read in conjunction with background principles of law, we think the better view is that an individual needs *both* a lawful purpose to be in a federal facility and a lawful purpose to carry a firearm in order for the individual to qualify for the exception in section 930(d)(3), but not necessarily that the two must be related. So understood, an otherwise law-abiding citizen who carries a constitutionally protected firearm into a post office that is generally open to the public would fall within the scope of that exception.

Under the "grammatical 'rule of the last antecedent,' . . . a limiting clause or phrase"—here, "incident to hunting or other lawful purpose"—"should ordinarily be read as modifying only the noun or phrase that it

---

[5] *See also Webster's Third New International Dictionary* 1142 (1986 ed.) (same); *Webster's II New Riverside University Dictionary* 618 (1988 ed.) ("[t]ending to arise or occur as a concomitant"); *The American Heritage Dictionary* 650 (2d coll. ed. 1982) (same); *The Random House Dictionary of the English Language* 966 (2d ed. 1987) ("likely or apt to happen").

[6] *See also Webster's Ninth New Collegiate Dictionary* at 609 ("dependent on or relating to another thing"); *Webster's II New Riverside University Dictionary* at 618 ("[c]ontingent upon or related to something else"); *The American Heritage Dictionary* at 650 (same); *Webster's Third New International Dictionary* at 1142 ("dependent on or appertaining to another thing").

immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *see also, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144–46 (2012) ("Scalia & Garner"). While "quite sensible as a matter of grammar," however, the last-antecedent "rule is not an absolute," and in this instance must "assuredly be overcome by other indicia of meaning." *Barnhart*, 540 U.S. at 26 (quoting *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 330 (1993)).

In this instance, the rule of the last antecedent would suggest that section 930's lawful-purpose requirement modifies "Federal facility"—that is, it would imply that an individual would need to enter the facility lawfully because it is open to the public or that the individual is an invitee. Such an understanding accords with the background principle that "[w]here a common-law principle is well established, [we] may take it as given that Congress has legislated with an expectation that the principle will apply" absent a clear indication to the contrary. *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 378 (2017) (cleaned up); *see also, e.g.*, *Jones v. Hendrix*, 143 S. Ct. 1857, 1876–77 (2023). "At common law, opening up private property to the general public implies a 'license to all persons to enter,' meaning that 'no person is a trespasser by merely entering therein' unless the property owner has given 'due notice' that such a person is banned." *Wolford v. Lopez*, 146 S. Ct. 2032, 2045 (2026) (quoting *Commonwealth v. Power*, 48 Mass. (7 Met.) 596, 602 (1844)); *see also* 3 William Blackstone, *Commentaries* *209. Applied here, as a property owner, the federal government can prohibit weapons on its property, including (within constitutional limits) by closing its property to the public. *Wolford*, 146 S. Ct. at 2045. But the default rule is that "*all* [may] enter private property open to the public unless specifically prohibited." *Id.* at 2045 (emphasis in original); *see also infra* Part II.B.3.

But, as in all statutory interpretation, "context matters." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (cleaned up); *see, e.g.*, *Revocation of Prior Monument Designations*, 49 Op. O.L.C. __, at *22–23 (May 27, 2025). The context of section 930(d)(3) suggests that following the last-antecedent canon would lead to an incomplete picture. The complete exception allows "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes." 18 U.S.C. § 930(d)(3). A "facility" is a "building or part thereof." *Id.* § 930(g)(1). Because hunting with firearms is an activity that must occur

outdoors, *see, e.g.*, *Wildlife Pres., Inc. v. Romero*, 153 F.4th 192, 204 n.12 (2d Cir. 2025) (citation omitted),[7] we think that "incident to a lawful purpose" must be understood distributively. *Cf.* Scalia & Garner at 214. That is, although the last-antecedent canon is a good rule of thumb (and grammar), "sometimes where a sentence contains several antecedents and several consequents," the reader should "apply the words to the subjects which, by context, they seem most properly to relate." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (cleaned up); *see also* 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction § 47:26, p. 448 (rev. 7th ed. 2014). Here, this principle supports interpreting the statute to require that both the *entry* into the federal facility and the *carrying* of the firearm must be for a lawful purpose.

This understanding tracks everyday experience with post offices. While most post offices are open to the public, that is not universally the case: There are postal facilities on military bases and past the security cordons at airports. Each is subject to its own statutes and regulations, which limit access to something less than the general public. *E.g.*, 10 U.S.C. § 2672 note (military installations); 49 C.F.R. § 1540.111 (airports and aircraft). And there are entirely lawful reasons to bring a firearm into a post office. For example, we recently concluded that "the Executive Branch may not, consistent with the Constitution, enforce section 1715" of title 18 to the U.S. Code to criminalize the mailing of "constitutionally protected firearms"—a conclusion whose reasoning necessarily implies that section 930(a) cannot be enforced in a way that makes it a felony to carry the boxed firearm into the facility from which it would be mailed. *Constitutionality of 18 U.S.C. § 1715*, 50 Op. O.L.C. __, at *15 (Jan. 15, 2026).

Carrying arms for self-defense when entering a building held open to the public is a paradigmatic lawful purpose.[8] The Supreme Court recog-

[7] True, it is theoretically possible that one might enter a federal facility while hunting on federal land—for example, to use the restroom or to pick up paperwork while hunting in a national park. But we do not think that is the most natural reading of the statute, as such events can hardly be described as "likely to occur." *Webster's Ninth New Collegiate Dictionary* at 609 (defining "incident").

[8] For the avoidance of doubt, our conclusion does not extend to firearms and other "dangerous weapon[s]," as defined in the statute, 18 U.S.C. § 930(g)(2), that are prohibited by law, such as undetectable firearms, *see id.* § 922(p)(1). As discussed below, *infra* Part II.B, our analysis is informed by the Second Amendment—a right that extends only to "the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle &*

nized as much in *District of Columbia v. Heller*, when it unequivocally stated that "the inherent right of self-defense" is "central to the Second Amendment right." 554 U.S. 570, 628 (2008). And it built on the point in its recent *Wolford* decision, which recognized that people who carry firearms for self-defense regularly visit places open to the public "in the course of their daily routines, such as gas stations, convenience stores, restaurants, coffee shops, drug stores, grocery stores, 'big box' stores, home improvement stores, barber shops or hair salons, dry cleaners, and laundromats." 146 S. Ct. at 2040–41. Although run by the federal government, a post office open to the public is a retail establishment that is analogous to these locations, requiring (typically) brief visits by law-abiding citizens to acquire everyday goods and services. Unless the property owner has clearly closed the property to firearms being carried for self-defense, such carrying is presumptively lawful. *See id.* at 2049 & n.10. Yet far from closing post offices to firearms, Congress expressly permitted the carrying of firearms incident to any lawful purpose.

Interpreting "lawful purpose" in section 930 to include self-defense in a building held open to the public is also consistent with other rules of statutory construction. For example, take the semantic canons of *noscitur a sociis* and *ejusdem generis*. *See Yates v. United States*, 574 U.S. 528, 543, 545–46 (2015) (plurality opinion). In the Second Amendment context, hunting is often paired with self-defense as an archetypal lawful purpose. *See, e.g.*, 15 U.S.C. § 7901(b)(2) (outlining Congress's purpose of "preserv[ing] a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting").[9] So if an individual who is not legally disabled from possessing a firearm enters a post office that is held

*Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *Heller*, 554 U.S. at 627). The carrying of prohibited weapons does not satisfy section 930(d)(3)'s requirement that the carrying be "lawful."

[9] *See also* 18 U.S.C. § 922 note (outlining Congress's purpose as being "to avoid hindering industry from supplying firearms to law abiding citizens for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting"); *Heller*, 554 U.S. at 599 ("[P]reserving the militia was [not] the only reason Americans valued the ancient right [of bearing arms]; most undoubtedly thought it even more important for self-defense and hunting."); *id.* at 636–37 (Stevens, J., dissenting) (noting "nonmilitary purposes [for bearing arms] like hunting and personal self-defense"); *McDonald v. City of Chicago*, 561 U.S. 742, 891 (2010) (Stevens, J., dissenting) ("Guns may be useful for self-defense, as well as for hunting and sport . . . .").

open to the public while properly carrying a firearm for self-defense, section 930(d)(3) applies to exempt them from section 930(a)'s carrying ban, as the individual is "lawful[ly] carrying" a firearm "incident to" a "lawful purpose[]." 18 U.S.C. § 930(d)(3).

Our understanding also helps to "interpret the statute," together with other federal firearms restrictions, "as a symmetrical and coherent regulatory scheme"—including how it "may be affected by other Acts, particularly where Congress has spoken subsequently." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co*., 513 U.S. 561, 569 (1995)). It is unclear why Congress would need to have more than a dozen different statutes regulating the possession of firearms on certain *types* of federal property, *see, e.g.*, 40 U.S.C. § 5104(e)(1)(A); 42 U.S.C. § 2278a, if section 930(a) created a near-blanket ban on carrying in *all* federal facilities. This is particularly so given that its "words describe an element of a criminal offense." *Ratzlaf v. United States*, 510 U.S. 135, 140–41 (1994) (citing *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990); *Potter v. United States*, 155 U.S. 438, 446 (1894)).

To take a specific example, shortly after the Court's decision in *Heller*, Congress recognized the right to bear arms under the "2d amendment to the Constitution," 54 U.S.C. § 104906(a)(1), and it prohibited the Secretary of the Interior from "promulgat[ing] or enforc[ing] any regulation that prohibits an" otherwise law-abiding "individual from possessing a firearm, including an assembled or functional firearm," within the National Park System, *id.* § 104906(b). The National Park Service has interpreted the resulting statutory structure as entitling law-abiding citizens to carry firearms onto parklands (under section 104906) but not into park buildings (under a narrow view of section 930(d)(3)). A person who is carrying a firearm on parklands for self-defense but who has to disarm before entering a building would not only render himself "vulnerable for th[e] period of time" during which he was disarmed, *Wolford*, 146 S. Ct. at 2048, he would potentially be arming an aggressor who could collect the firearm.[10] We, like the courts, will reject such an interpretation that

[10] This does not even account for other risks of leaving a firearm outside of a building in an area frequented by the public—for example, the risk that a child visitor may stumble upon the firearm while their parents are inside and accidentally harm themselves.

"make[s] a hash" of the overall statutory scheme. *Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2364 (2022).

**B.**

This interpretation is further supported by the canon of constitutional avoidance, which "imposes"—at minimum—a "'clarity tax' on Congress" when it legislates in ways that raise constitutional doubts. *Application of the Rehabilitation Act and Americans with Disabilities Act to State Institutionalization of Patients with Severe Mental Illness or Disabilities*, 50 Op. O.L.C. __, at *12 (June 18, 2026) ("*Integration Mandate*") (quoting *Biden v. Nebraska*, 143 S. Ct. 2355, 2376–77 (2023) (Barrett, J., concurring)); *see also* John F. Manning, *Clear Statement Rules and the Constitution*, 110 Colum. L. Rev. 399, 403 (2010)).[11] Here, although we need not definitively resolve the issues implicated by them, we have such doubts regarding whether requiring an otherwise law-abiding citizen to disarm before entering a post office would survive the Supreme Court's two-step analysis that "look[s] to history" in order to determine whether a restriction falls within the traditional "scope of the right" to bear arms. *Wolford*, 146 S. Ct. at 2042. The very existence of those doubts counsels in favor of a broad interpretation of the exception in section 930(d)(3) as applied to post offices.[12]

[11] As we have previously recognized, this is the weaker of two versions of the constitutional-avoidance canon. *See Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense*, 49 Op. O.L.C. __, at *10–11 (June 21, 2025). In its stronger form, the canon can require that we read implicit exceptions into statutes that are otherwise unqualified in scope. *See, e.g.*, *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 350–57 (1995) ("*Application of 28 U.S.C. § 458*"). The existence of the "lawful purpose" exception in section 930(d) obviates the need to determine whether to imply such an exception under the strong form of constitutional avoidance—a form of reasoning that is, in many ways, indistinguishable from holding that section 930(a) is unconstitutional in certain applications.

[12] For the avoidance of doubt, although our constitutional analysis under the first step of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*'s two-prong approach applies to section 930(a) outside the context of post offices, we have not undertaken performing the historical analysis required under *Bruen*'s second step in any other context. Thus, nothing in Parts II.B.2 or II.B.3 of this opinion should be understood to reach any conclusions about other federal facilities.

**1.**

The right to keep and bear arms pre-dates the Constitution. We "codified" in the Second Amendment a "pre-existing right," rooted in nature and "inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (cleaned up); *see also, e.g.*, William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1465, 1468–69 (2024).

There is little room for doubt that section 930(a) "clashes with the 'plain text' of the [Second] Amendment's language"—regardless of the government building to which it is applied. *Wolford*, 146 S. Ct. at 2043 (quoting *Bruen*, 142 S. Ct. at 2129–30). The statute applies to "the people"—that is, "members of the political community." *Id.* (quoting *Heller*, 554 U.S. at 580); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). It concerns "Arms," U.S. Const. amend. II—that is, "weapon[s] customarily used for offensive or defensive purposes," *Wolford*, 146 S. Ct. at 2043. Specifically, section 930(a) prohibits individuals from "bear[ing]"—that is, "carrying"—those arms. *Id.* (alteration in original) (quoting *Bruen*, 142 S. Ct. at 2134–35). Because it falls within the plain text of the Second Amendment, the restriction is "presumptively unconstitutional." *Id.* at 2044.

**2.**

As applied to post offices that are generally open to the public, we have grave doubts that the government could carry its burden to overcome that presumption by demonstrating the restriction "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. That would be a high hurdle because, for nearly two centuries, there was *no* "historical tradition of firearm regulation" in post offices. *Id.*; *see also id.* at 2135. Moreover, it is unlikely that the government would be able to overcome that hurdle by reference to the "sensitive places" doctrine because ordinary post offices appear to bear no legally significant resemblance to the "legislative assemblies, polling places, and courthouses" where the Court has accepted that the government may presumptively restrict firearms. *Id.* at 2133.

**a.**

When evaluating whether a law is consistent with our Nation's historical tradition of firearms regulation, we begin by considering whether that law "addresses a general societal problem that has persisted since [the Founding]." *Id.* at 2131. If such a problem is apparent but we are unable to find "a distinctly similar historical regulation addressing that problem," the "lack" of such a historical regulation is "evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* That appears to be the case here.

Violence at post offices and against postal workers is a general societal problem that even the Postal Service seems to acknowledge existed at—and has existed since—the Founding. The postal system predates our Nation. *See* U.S. Postal Serv., *The United States Postal Service: An American History* 1–4 (2025 ed.), https://perma.cc/ST55-ZVJK ("*Postal Service History*"). The Constitution then granted Congress the enumerated power to "establish Post Offices and post Roads." U.S. Const. art. I, § 8, cl. 7. And presumptively because of the ongoing threat to the mail, Congress soon inferred from this enumerated power an "implied power" to "punish those[] who steal letters from the post-office[] or rob the mail." 3 Joseph Story, *Commentaries on the Constitution* 38 (1833); *see also M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 385 (1819) (explaining in dicta that "the power of establishing post offices and post roads[] involves that of punishing the offence of robbing the mail").

By all appearances, such violence directed toward the postal system and postal workers continued to pose an intractable societal problem throughout the nineteenth and twentieth centuries. *See Postal Service History* at 17 (describing the dangers to mail carriers of traveling by stagecoach). In 1921, serving as a mail clerk was so dangerous that the postmaster general armed mail clerks with pistols and authorized them to "shoot to kill." *Id.* at 23. And by the 1980s and 1990s, shootings at post offices had become so common that "going postal" entered the American lexicon as a term for "becom[ing] uncontrollably angry."[13]

---

[13] Austin Harvey, *The Chilling Story of the Post Office Shootings that Inspired the Phrase 'Going Postal,'* All That's Interesting (Jan. 29, 2025), https://perma.cc/K4CW-

Yet Congress had *never* prohibited carrying firearms specifically in post offices. The Founding generation's solution to the problem was to impose severe penalties for mail robbery. In 1792, Congress made it a crime, punishable by "death," to "rob the mail . . . of any letter or packet," to "steal such mail," or to "steal and take . . . from out of any post-office, any letter or packet." Act of Feb. 20, 1792, ch. 7, § 17, 1 Stat. 232, 237 ("1792 Act"). Two years later, Congress made it a crime, again punishable by "death," to "rob any carrier of the mail . . . of such mail." Act of May 8, 1794, ch. 23, § 17, 1 Stat. 354, 361. Several years after that, Congress amended the punishment to a maximum of 40 lashes and 10 years of imprisonment for a first offense, and death for a second offense. *See* Act of Mar. 2, 1799, ch. 43, § 15, 1 Stat. 733, 736. But if a first offender "much wound[ed]" the mail carrier or put the mail carrier's "life in jeopardy[] by the use of dangerous weapons," the punishment remained "death." *Id.* Congress did not impose criminal penalties for carrying weapons *into* a post office until its general bar on weaponry in federal buildings in the 1980s. *Supra* Part I.

Instead, the Executive Branch was the first entity that restricted firearms in post offices. But even it did not do so until the latter half of the twentieth century. In 1964, it promulgated regulations prohibiting the possession of firearms in federal buildings. *See* 29 Fed. Reg. 15,972, 15,982 (Dec. 1, 1964); *see also Ayala*, 711 F. Supp. 3d at 1342. And in 1972, it promulgated regulations prohibiting the possession of firearms in post offices specifically. *See* 37 Fed. Reg. 24,346, 2,4347 (Nov. 13, 1972); *see also Ayala*, 711 F. Supp. 3d at 1342.

That Congress historically addressed the problem of violence at post offices and against postal workers through "materially different means" suggests that there is no history or tradition of restricting firearms in post offices. *Bruen*, 142 S. Ct. at 2131. Since history and tradition is the yardstick by which the right to keep and bear arms codified in the Second Amendment is measured, this reasoning suggests that section 930(a) is inconsistent with that right as applied to post offices open to the public—as at least two lower courts have found. *See Firearms Pol'y Coal. Inc. v. Bondi*, 805 F. Supp. 3d 721, 727 (N.D. Tex. 2025); *Ayala*, 711 F. Supp. 3d at 1341–42.

---

MPZR; *see also* Scott Williamson, *The Surprising Origin of the Phrase 'Going Postal*,*'* Grunge (Dec. 14, 2021), https://perma.cc/44FH-E888.

One counterargument is that modern post offices are not analogous to post offices from the Founding era because the latter were not located in government buildings. *See Firearms Pol'y Coal.*, 805 F. Supp. 3d at 729. "Until the early 1900s, . . . the Post Office was [often] located in the postmaster's home or other place of business, such as a general store." U.S. Postal Serv., *Sources of Historical Information on Post Offices, Postal Employees, Mail Routes, and Mail Contractors* at 14 (2022), https://perma.cc/5YNC-3RCQ ("*Sources of Historical Information*"). Only "[a] small percentage of Post Offices—fewer than 1 percent before 1910—were located in government-owned buildings." *Id.*

It is unclear why this distinction should make a constitutional difference to the question before us. Congress was provided the power to "establish Post Offices," without any requirement that it do so on property that the federal government owned. U.S. Const. art. I, § 8, cl. 7. And the 1792 law described above made robbing the mail a crime regardless of the fact that many post offices were then located on privately owned land. *See* 1792 Act § 17, 1 Stat. at 237; *Sources of Historical Information* at 14. Because many members of Congress were themselves among the Framers of the Constitution, courts typically give considerable weight to such early understandings of the power provided to Congress. *See Marsh v. Chambers*, 463 U.S. 783, 790 (1983). So do we. *See, e.g.*, *The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them*, 25 Op. O.L.C. 188, 202 (2001) (relying on evidence of President George Washington's understanding of his constitutional authority to deploy the armed forces abroad).

Even if we were to limit our review to the "small percentage of Post Offices . . . located in government-owned buildings" at the Founding, we would still need to look for some evidence that the government restricted the carrying of firearms in those federal buildings. *Sources of Historical Information* at 14. We are aware of no such evidence, and at least two courts that have examined the issue have similarly found none. *See Ayala*, 711 F. Supp. 3d at 1341–42; *Firearms Pol'y Coal.*, 805 F. Supp. 3d at 729–30. Because the *government* bears the burden of proof at this stage of the *Bruen* analysis, this lack of evidence alone is enough to give us pause. But consistent with the instructions of *Bruen*, we also look for "a well-established and representative historical analogue" to a firearms restriction in post offices. 142 S. Ct. at 2133 (emphasis omitted).

**b.**

Even expanding our review to statutes that are relevantly similar to section 930(a)—rather than historical twins—our doubts are not assuaged. The nearest such analogue that we have been able to locate is the so-called "sensitive places" doctrine, under which the government may restrict the carrying of firearms in certain locations without violating the Second Amendment. *See id.* The archetypical "sensitive places" where firearms may be restricted are "legislative assemblies, polling places, and courthouses." *Id.* But "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Id.* Indeed, the scholarship cited by the Court in referencing this doctrine suggests that the number of Founding-era restrictions at these sensitive places was exceptionally small. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235–36 (2018) ("Kopel & Greenlee").[14]

Post offices that are generally open to the public do not appear to be legally analogous to the archetypical "sensitive places" under the second step of the *Bruen* analysis. 142 S. Ct. at 2133. If we were trying to conclusively "[d]etermin[e] whether this condition [was] met," we would need to consider both the "how" and the "why" of the relevant regulation—"that is, whether it imposed a restriction similar to that imposed by the challenged law" and "whether its rationale was similar to that of the new law." *Wolford*, 146 S. Ct. at 2044. "Discerning what the original meaning of the Constitution requires in this or that case may sometimes be difficult," because it requires making inferences about the understandings of people long dead and doing so based on incomplete sources. *United States v. Rahimi*, 144 S. Ct. 1889, 1909 (2024). That inquiry is further compli-

[14] The relevant scholarship cited by the Supreme Court in *Bruen* found only two laws in Maryland that prohibited firearms in legislative buildings and one constitutional provision in Delaware that prohibited bringing firearms to polling places. *See* Kopel & Greenlee at 235–36; *see also* 1647 Md. Laws 216 ("[N]oe one shall come into the howse of Assembly (whilst the howse is sett) with any weapon uppon perill of such fine or censure as the howse shall thinke fit."); 1650 Md. Laws 273 ("That none shall come into eyther of the houses whillst they are sett, with any gun or weapon uppon perill of such fine or censure as the howses shall thinke fitt."); Del. Const. art. 28 (1776) ("To prevent any Violence or Force being used at the said Elections, no person shall come armed to any of them, and no Muster of the Militia shall be made on that Day.").

cated in this instance because the early English statutes recognized to be predecessors of the "sensitive places" doctrine—"[t]he most prominent [being] the 1328 Statute of Northampton," *Bruen*, 142 S. Ct. at 2139—were recognized, before the Framers were ever born, never to have been enforced under their literal terms. Kopel & Greenlee at 222–26 (discussing *Sir John Knight's Case* (1686) 87 Eng. Rep. 75 (KB)).

Fortunately, because we are asking only whether applying section 930(a) to post offices raises any grave constitutional doubts, we need not engage in a deep historical dive into the hows and whys of these early English statutes. Federal law contains direct modern descendants of two of the three categories of sensitive places recognized by *Bruen*, which have nothing to do with section 930(a): Congress, 40 U.S.C. § 5104(e)(1); and federal courthouses, 18 U.S.C. § 930(e). The absence of a direct analogue to polling places is easily explicable by the fact that the Framers entrusted regulating—and therefore protecting—federal elections to the states. *See Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __, at *2 (May 12, 2026) ("[R]egulating elections is primarily the purview of states.").

To be sure, Congress could have intended section 930(a) and these more specific statutes to punish overlapping conduct. As the Court has recognized, even "substantial" overlap between two provisions is "not uncommon in criminal statutes"—let alone legally problematic. *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014) (citing *Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995)). But "[w]hen Congress adopts a new law against" an established legal backdrop, we "generally presume[] the new provision should be understood to work in harmony with what has come before." *Monsalvo Velázquez v. Bondi*, 145 S. Ct. 1232, 1242 (2025) (collecting authorities). The existence of these modern-day descendants of sensitive-places regulations gives us considerable pause from adopting the view that section 930(a) was intended to cover the same conduct for the same purpose and thus fit into the same constitutional tradition.

**c.**

A critic might suggest that it is inappropriate for us to rely on the canon of constitutional avoidance because the Court already stated in *Heller* that the Constitution permits the government to restrict firearms in govern-

ment buildings. In explaining its conclusion that the Second Amendment protects a preexisting, "individual right unconnected with militia service," 554 U.S. at 582, to "hav[e] and us[e] arms for self-preservation and defence," *id.* at 594 (quoting 1 William Blackstone, *Commentaries* *140), the Court caveated that nothing in its *Heller* opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626–27. Later, in *McDonald v. City of Chicago*, the Court held that the Second Amendment applies to the states through the Fourteenth Amendment and then it "repeat[ed]" *Heller*'s "assurances." 561 U.S. at 786 (plurality opinion).

Because the discussions of "sensitive places" in both *Heller* and *McDonald* were dicta, neither case resolved whether post offices—or any other government buildings, for that matter—are sensitive places where firearms may be prohibited. Dicta are "remarks made in the course of a decision but not essential to the reasoning behind that decision." Bryan A. Garner et al., *The Law of Judicial Precedent* 44 (2016) ("Garner et al."). As the Supreme Court has repeatedly explained, "[i]t is to the holdings of [its] cases, rather than their dicta, that [readers] must attend." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379 (1994).[15] Relatedly, the Supreme Court has also cautioned that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). To the contrary, it has "emphasize[d]" that its "opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1155 (2023). These

[15] *See also, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1404 (2020); *S. Union Co. v. United States*, 567 U.S. 343, 352–53 n.5 (2012); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996); *accord Webster v. Fall*, 266 U.S. 507, 511 (1925) (explaining that matters "neither brought to the attention of the court nor ruled upon" are "not to be considered . . . precedent[]"); 18 *Moore's Federal Practice* § 134.03[2] (3d ed. 2023) ("One way to distinguish between dictum and the reasoning necessary to the holding is to ask whether the statement in question could be deleted without impairing the basis of the court's decision."); John Chipman Gray, *The Nature and Sources of the Law* 261 (2d ed. 1972) ("Precedent" is only that "which is necessary for the decision of a particular case.").

principles ensure that the statements made in response to "[t]he question . . . before the Court [that was] investigated with care" is not incautiously applied to some issue that the Court had not "completely investigated." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821) (Marshall, C.J.). And they counsel courts and litigants not to "comb the[] pages" of the Court's opinions looking "for stray comments and stretch[ing] them beyond their context—all to justify an outcome inconsistent with [the] Court's reasoning and judgments." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022).

*Heller* involved laws in the District of Columbia that banned the possession of handguns in the home and required that any lawful firearm in the home be disassembled or bound by a trigger lock. *See* 554 U.S. at 628. *McDonald* involved Chicago's similar ordinances. *See* 561 U.S. at 749–50 (plurality opinion). Neither case involved firearm possession in a government building or other sensitive place. *See Ayala*, 711 F. Supp. 3d at 1348–49; *Kanter v. Barr*, 919 F.3d 437, 453–54 (7th Cir. 2019) (Barrett, J., dissenting). *But see Nastri*, 828 F. Supp. 3d at 326 (suggesting the "Supreme Court has repeatedly confirmed that" government buildings are "'sensitive places'" (quoting *Bruen*, 142 S. Ct. at 2133)). Instead, the Court discussed firearms restrictions in "government buildings" only as a caveat to make clear that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Because the Court's statements that government buildings are sensitive places were unnecessary to the resolution of either case or controversy, neither statement "constitutes the precedent" of the Court. Garner et al. at 44.[16]

To be sure, "[w]e should not"—and do not—"idly ignore considered statements [of] the Supreme Court" whether technically in dicta or otherwise, *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 561 (3d Cir. 2003) (en banc) (citation omitted), "particularly where" such statements are "consistent with longstanding

---

[16] It would be particularly problematic to treat the discussion of sensitive places in *McDonald* as creating binding law because, in addition to being dicta, it is found in a part of the opinion belonging to only a plurality of four. *See* 561 U.S. at 786 (plurality opinion). When the Court splinters on the rationale for its judgment, we are to look for the "position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted). Because there were not five votes for the discussion of sensitive places in *McDonald*, it is (at most) informative of the views of those justices. *See Integration Mandate* at *7–11.

Supreme Court precedent," *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (collecting cases regarding the treatment of Supreme Court dicta by lower courts); *see also* Garner et al. at 69–70. But ultimately, "[d]ictum settles nothing, even in the court that utters it." *Jama v. ICE*, 543 U.S. 335, 351 n.12 (2005). It certainly does not obviate "our duty to provide an independent assessment of what faithful execution [of the law] means," *Integration Mandate* at *12—particularly in an evolving area of law, *cf. NCAA v. Alston*, 141 S. Ct. 2141, 2158 (2021) (noting that "aside[s]" and "stray comments" are not binding); *id.* at 2167 (Kavanaugh, J., concurring) ("The Court makes clear that the decades-old 'stray comments' . . . were dicta and have no bearing on [the current case].").

In this instance, we must consider the language from *Heller* and *McDonald* in view of the Court's more recent opinion in *Bruen*, which "fleshed out the process of historical analysis required in a Second Amendment case." *Wolford*, 146 S. Ct. at 2043. *Bruen* indicates that firearms restrictions applicable to government buildings are not automatically exempt from its two-step analysis. Otherwise, the list of examples the Court provided—which includes specific types of government buildings (legislative assemblies and courthouses)—would have been unnecessary. Instead, *Bruen* draws its list of "18th- and 19th- century 'sensitive places,'" 142 S. Ct. at 2133, from scholarship whose entire thesis is that "[n]ot all government buildings are the same," Kopel & Greenlee at 293 (emphasis omitted). In doing so, it implicitly leaves space for case-by-case determinations within that category.[17] As a result, we evaluate whether a regulation on firearms in a government building is consistent with the Second Amendment by examining whether the regulation is sufficiently analogous to historical regulations of firearms in "sensitive places," such as "legislative assemblies, polling places, and courthouses."

---

[17] *See, e.g.*, *Hunter v. Cortland Hous. Auth.*, 714 F. Supp. 3d 46, 49–50, 57 (N.D.N.Y. 2024) (finding that applicants were likely to succeed on the merits of their claim that a public-housing authority's categorical ban on firearms violated the Second Amendment); *Columbia Hous. & Redev. Corp. v. Braden*, 663 S.W.3d 561, 568 (Tenn. Ct. App. 2022) ("[W]e cannot say that an individual's public housing unit is analogous to that of [the] established sensitive government buildings [listed in *Bruen*]. . . . [W]e conclude that a total ban on the ability of law-abiding residents . . . to possess a handgun within their public housing unit for the purpose of self-defense is unconstitutional under the Second Amendment.").

*Bruen*, 142 S. Ct. at 2133.[18] That a firearms regulation concerns a government building does not alone suffice to ensure constitutionality under the Second Amendment.

**3.**

In our evaluation of whether to apply the canon of constitutional avoidance, we have considered the argument that the Second Amendment might apply differently when Congress exercises its reserved "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. After all, the "standard common-law rule on access to private property held open to the public" is that every person "may enter *unless* expressly prohibited from doing so." *Wolford*, 146 S. Ct. at 2040 (emphasis added). Section 930(a) could, the argument goes, be seen as merely the exercise of Congress's authority as proprietor to exclude firearms from federal properties.

It is indisputably true that when it comes to federal property, "Congress exercises the powers both of a proprietor and of a legislature over the public domain." *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976). And the Court has repeatedly held that "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). It has emphasized that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their" constitutional rights "on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the [person's] activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985).

As noted above, the fact that Congress has opened most post offices to the public creates the default rule that members of the public may enter the premises carrying firearms. *Supra* Part II.A.2. But, at common law,

[18] True, these statements are themselves arguably dicta, as *Bruen* centrally concerned the "proper cause" standard for obtaining a license to carry under New York law. 142 S. Ct. at 2122–23. We cite them, however, not for a binding conclusion on what constitutes a "sensitive place" where firearms may presumptively be regulated but rather for the proposition that neither *Heller* nor *McDonald* were the final word on the subject.

"all such licenses are in their nature revocable." *Power*, 48 Mass. (7 Met.) at 602. Within outer limits set by common-carrier and public-accommodation laws, an owner who has generally opened his property to the public may still make permission to enter "conditional" on compliance with specified rules, so long as he provides "due notice" of the conditions. *Id.* at 602–03. As Judge Thomas Cooley explained, notice of such restrictions may be given "by placard or otherwise." Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 303 (1879). A statute is certainly one method, other than a placard, to give notice of a restriction. *Cf. Bryan v. United States*, 524 U.S. 184, 193 (1998) (reciting the "background presumption that every citizen knows the law"). Such a "conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with." Restatement of Torts § 168 (1934).

At the same time, however, private-property rules likely cannot be imported wholesale onto government lands or buildings for one simple reason: State and federal governments are bound by the Constitution, including the Bill of Rights; private parties are not. "States may not adopt property-law rules that violate constitutional rights." *Wolford*, 146 S. Ct. at 2050 n.13. And "[t]he Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business." *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion). Similarly, the Fourth Amendment applies on public property in the workplaces of government employees—albeit subject to a slightly different understanding of what reasonable expectation of privacy an employee has at the workplace. *See O'Connor v. Ortega*, 480 U.S. 709, 718–19 (1987) (plurality opinion).

The best course for demarcating the extent to which the federal government can bar firearms in its capacity as proprietor is to borrow a mode of analysis from another Bill of Rights guarantee: the "'forum based' approach for assessing restrictions that the government seeks to place on the use of its property" for expressive purposes under the First Amendment. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (citing *Cornelius*, 473 U.S. at 800). There are generally three regimes by which the Government can regulate an individual's expression on government property. At one end of the spectrum is the "nonpublic forum," which is a "space that 'is not by tradition or designation a forum

for public communication,'" *Mansky*, 585 U.S. at 11–12 (citation omitted), and over which the government largely retains the same control as private owners, *see, e.g.*, *Lee*, 505 U.S. at 678–85. At the other end is the "traditional public forum," which includes "parks, streets, sidewalks, and the like." *Mansky*, 585 U.S. at 11. "[T]he government may impose reasonable time, place, and manner restrictions on private speech" in a traditional public forum, "but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* In between the two, "[t]he Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects," so long as those limitations are enforced in an even-handed manner. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001).[19]

Although perhaps not a one-to-one match, the forum-based approach to the First Amendment appears to align fairly well with how the government functionally has regulated firearms on government property. The handful of "sensitive places" where guns have been restricted since the Founding are akin to non-public fora—at least during those periods of time when the sensitive activities are occurring. *See supra* Part II.B.2.b; 40 U.S.C. § 5104(e)(1)(A) (prohibiting firearms in the Capitol Buildings and on Capitol Grounds); 18 U.S.C. § 930(e) (prohibiting firearms in federal courthouses). The government can also create *new* non-public fora by closing the property to the public in a way that would not have an easy historical analogue to a sensitive place.[20] On the other end of the spectrum, in areas that are generally open to *all* members of the public, the government historically has *not* limited guns on such property. And under

---

[19] There is technically a fourth category of fora for "spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'" *Mansky*, 585 U.S. at 11 (citation omitted). Because these so-called designated public fora "share essential attributes of a traditional public forum," *Summum*, 555 U.S. at 469, and "[t]he same standards apply" to them, *Mansky*, 585 U.S. at 11, we treat them as equivalent to traditional public fora for the purposes of this opinion.

[20] True, those who work on the property may not be able to exercise the right to keep and bear arms without the permission of their employer. But the law has long recognized that the government as an employer can limit an individual's constitutional rights in at least certain ways that it cannot as a regulator. *Garcetti v. Ceballos*, 547 U.S. 410, 417–20 (2006) (summarizing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), and its progeny).

a history-based test, it *could not* adopt limitations on when, how, and what kinds of constitutionally protected weapons may be carried in such areas, because any such limitations would have no historical analogue and would be inconsistent with our historical tradition of firearm regulation. In between, for buildings that are opened to the public for some but not all purposes, a more nuanced analysis would be required about whether a restriction is "reasonable in light of the purpose served by the" building. *Good News Club*, 533 U.S. at 107 (quoting *Cornelius*, 473 U.S. at 806).[21]

Assuming such a standard here, post offices that are open to the public would likely fall within the intermediate zone of government property where Congress *could* limit the circumstances under which, and the purposes for which, a citizen may exercise his Second Amendment rights. The Supreme Court has already concluded that post offices and the sidewalks outside them are not so open to the public that any restriction on constitutional rights thereupon must satisfy strict scrutiny. *Kokinda*, 497 U.S. at 727–30 (plurality opinion). At the same time, neither Congress nor the Postal Service has purported to completely close post offices to all firearms. *See, e.g.*, 18 U.S.C. § 930(d)(1)–(2) (allowing certain individuals to enter government facilities with firearms); *id.* § 1715 (exempting certain individuals from the putative ban on mailing guns). As a result, post offices would probably best be considered limited-purpose fora for firearms.

"We are mindful" that any line we draw on this subject will be fuzzy and "that this area of law is still being developed." *See Religious Restrictions on Capital Financing for Historically Black Colleges and Universities*, 43 Op. O.L.C. 191, 197 (2019) (evaluating the constitutionality of funding for faith-based organizations at a time when there was "not yet a robust post-*Trinity Lutheran* body of case law in the lower courts" (citation omitted)). We need not decide how extensively Congress can limit firearms in federal facilities because, for the reasons discussed above, we conclude that Congress has already exempted the lawful carry-

[21] We recognize that this framework relies on a "means-end scrutiny" that is not available under the Second Amendment following *Bruen*. 142 S. Ct. at 2125–26. In the absence of further guidance from the Court, however, the alternative seems to be to read the *Heller* dicta suggesting that all government buildings are sensitive places in a way inconsistent with *Wolford*'s statement that the government "may not adopt property-law rules that violate constitutional rights." 146 S. Ct. at 2050 n.13.

ing of constitutionally protected firearms in post offices. *See supra* Part II.A.

### C.

In reaching this conclusion, we are aware of three district court decisions that have adopted a narrower view of the "other lawful purposes" exception in section 930(d)(3)—without addressing any constitutional concerns. *See, e.g.*, *De la Cruz-Bancroft*, 2010 WL 8752034.[22] Those opinions predate *Bruen*, making the lack of any discussion in these cases about the difficulties of section 930(d)(3) under the *Bruen* framework entirely explicable. They concluded that section 930(d)(3) applies only if the "lawful purpose" for carrying the firearm "is related to the federal facility" into which the firearm is brought. *Id.* at *2. This conclusion followed from a concern that interpreting section 930(d)(3) more broadly would "not give full effect to the entire statute" because "[i]f mere lawful possession of the weapon outside the facility were enough, then there would be no need for the phrase 'hunting or other lawful purposes.'" *Id.* at *3. A second, related concern was that the exception "would largely swallow the prohibition" because "[i]f mere lawful possession of the firearm *outside* the Federal facility were enough to permit someone to bring it inside, virtually anyone could bring such a weapon inside a Federal facility for any reason." *Id.* (emphasis in original).

We respectfully disagree. The President has an independent constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And our Office has a related duty to assess what faithful execution means, even if doing so requires disagreeing with a federal court. *See Integration Mandate* at *12. We part ways with the district courts that have construed section 930(d)(3) narrowly, as their interpretation does not follow from the plain text of the statute. If the statute was meant to require a nexus between the "other lawful purposes" for which someone was carrying a firearm to the purposes for which the individual was entering the facility, Congress could have framed section 930(d)(3) to

[22] The other opinions addressing section 930(d)(3) have relied upon the interpretation adopted in *De la Cruz-Bancroft* and provided no additional analysis of that statute. *See Yorzinski*, 39 F. Supp. 3d at 227; *Tagore v. United States*, No. 09-cv-27, 2011 WL 13124026, at *27 (S.D. Tex. July 22, 2011), *aff'd in part & rev'd in part*, 735 F.3d 324 (5th Cir. 2013).

state: "Subsection (a) shall not apply to . . . the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting or other lawful purposes *for carrying a firearm or other dangerous weapon in a Federal facility*." Furthermore, as we addressed in Part II.A.2, "hunting" is an activity that ordinarily takes place outside, at least in the context of firearms. Requiring a nexus between the purpose for which someone is carrying a firearm and the purpose for which that individual is entering a federal facility would render the "hunting" provision in section 930(d)(3) nugatory.

Moreover, it does not follow that construing section 930(d)(3) according to the words that Congress chose would swallow the general prohibition on firearms in federal facilities. Section 930(a) still prohibits an individual from carrying a firearm or other dangerous weapon into a federal facility incident to an unlawful purpose, even if that individual is otherwise not legally disabled from carrying a firearm. Consider the hypothetical example of a citizen who has a state-issued concealed-carry permit and enters a post office with a constitutionally protected firearm but for the purpose of committing a simple battery against an employee at the facility who is on vacation in another state. The individual would be "lawful[ly] carrying" his firearm, but the act of carrying that firearm into the post office would not be "incident to" a "lawful purpose[]" because, in that scenario, the purpose would be criminal activity. 18 U.S.C. § 930(d)(3). The individual would not be covered by section 930(d)(3) and therefore could be prosecuted under section 930(a).

Conversely, consider the hypothetical example of a person who is forbidden from possessing a firearm—for instance, a convicted felon, *see id.* § 922(g)(1); or an illegal alien, *see id.* § 922(g)(5). Even if such a person were carrying a firearm for the purpose of self-defense, the individual would not be "lawful[ly] carrying" his firearm, because his possession of the firearm would be unlawful under section 922(g). *Id.* § 930(d)(3). Thus, the "lawful carrying" and "lawful purpose[]" requirements in section 930(d)(3) both do independent work. *Id.*

It also does not follow that construing section 930(d)(3) to allow for the exercise of constitutional rights would render section 930(d)(2) superfluous. Section 930(d)(2) provides that section 930(a) does not apply to "the possession of a firearm or other dangerous weapon by a Federal official or a member of the Armed Forces if such possession is authorized by law."

*Id.* § 930(d)(2). Subsections (d)(2) and (d)(3) are not coextensive. Subsection (d) supplies the defenses not just for subsection (a) ("Federal facilities") but also, by reference, for subsection (e) ("Federal court facilities"). *See id.* § 930(e)(2). But only the defenses in subsection (d)(1) and (d)(2) apply to federal court facilities. *See id.* So "Federal official[s]" and "member[s] of the Armed Forces" who are "authorized by law" to possess firearms may carry firearms into federal court facilities, *id.* § 930(d)(2), but other individuals may not do so, even if the carrying is "incident to hunting or other lawful purposes," *id.* § 930(d)(3). Separating the defense for federal officials and members of the Armed Forces into subsection (d)(2) is not surplusage but rather a structurally necessary part of the statute.

Even if our view of the statute *did* render certain terms surplusage, that canon of construction would give way to another: the canon of constitutional avoidance. *See supra* Part II.B. Here, the Supreme Court has held that the Constitution protects "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595, which extends to "the possession and use of weapons that are 'in common use,'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). And at least two federal courts have held that this "blanket restriction on firearms possession in post offices is incongruent with the American tradition of firearms regulation." *Ayala*, 711 F. Supp. 3d at 1348; *see also Firearms Pol'y Coal.*, 805 F. Supp. 3d at 731 (similar). *But see Nastri*, 828 F. Supp. 3d at 329–30. Although we need not reach a firm conclusion as to section 930's constitutionality, these courts' understanding is certainly consistent with our view that banning the mailing of firearms does not pass constitutional muster. *See Constitutionality of 18 U.S.C. § 1715* at *11–12. It also comports with the Court's most recent articulation of the Second Amendment right: that it precludes barring law-abiding citizens who are lawfully carrying arms "from entering many places that people routinely visit in the course of their daily routines," as such outlawing of commonly used weaponry leaves citizens "vulnerable for th[e] period of time" during which they are unarmed. *Wolford*, 146 S. Ct. at 2040–41, 2048.

In short, we will not interpret the statute in a way that raises serious constitutional doubts if "an alternative interpretation of the statute is fairly possible." *Constitutionality of Disparate-Impact Liability Under Title VII*, 50 Op. O.L.C. __, at *14 (June 9, 2026) (citation omitted). For the reasons

discussed above, section 930(d)(3) can be fairly read to permit the carrying of firearms in pursuit of the individual right of self-defense.

**III.**

Finally, exercising its general authority to manage its property, the Postal Service has also adopted a regulation providing that, "[n]otwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes." 39 C.F.R. § 232.1(*l*); *see also* 37 Fed. Reg. 24,346, 24,347 (Nov. 13, 1972). Because that regulation does not include any exception analogous to section 930(d)(3), the saving construction discussed above is not available.

We conclude that the Postal Service's regulation is unlawful as applied to the otherwise law-abiding citizens carrying constitutionally protected firearms for self-defense in post offices open to the public. Accordingly, the Executive Branch may not enforce 18 U.S.C. § 930(a) or the Postal Service's regulations against a law-abiding individual who carries a constitutionally protected firearm into a post office for the purpose of self-defense.

In 1988, via section 930, Congress addressed the question of when individuals may carry firearms in federal facilities. This specific and later-in-time congressional determination narrowed the general authority of the Postal Service to manage its property. *Cf. Harmonizing the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and Section 214 of the Housing and Community Development Act of 1980*, 50 Op. O.L.C. __, at *18 (Feb. 18, 2026).[23] At the time, the rule promulgated by the Postal Service did *not* include the caveat "[n]otwithstanding the provisions of any other law, rule, or regulation." 39 C.F.R. § 232.1(*l*).

[23] To be sure, this principle is in some tension with "[t]he presumption disfavoring implied repeals"—but it is just that: a presumption. *United States v. Fausto*, 484 U.S. 439, 461–63 n.9 (1988) (Stevens, J., dissenting) (collecting authorities). That presumption is weakened here by the fact that *Congress* passed a statute that is at odds with a regulation. But even if the regulation and the statute were on equal legal footing, the presumption against implied repeal can be overcome by (among other things) an "irreconcilable conflict." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)); *see also Morton v. Mancari*, 417 U.S. 535, 550–51 (1974).

The Postal Service added that language in 2007 to "eliminate potential conflicts with other *laws*, rules or regulation which may allow the possession of [firearms] for other than official purposes." 72 Fed. Reg. 12,565, 12,565 (Mar. 16, 2007) (emphasis added).

The Postal Service may not override Congress's determination—at least in the absence of any indication that post offices present distinct issues that Congress did not consider when legislating about federal facilities. "It is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (alteration accepted) (citation omitted). And agencies may not use their regulatory authority in a manner that "contradict[s] congressional policy." *Brown & Williamson Tobacco*, 529 U.S. at 139. As noted above, congressional policy does not bar otherwise law-abiding officials from carrying constitutionally protected firearms into a post office that is open to the public for the purposes of self-defense.[24] We do not address post offices that are closed to the public or federal facilities other than post offices.

LANORA C. PETTIT
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

[24] Even if we were to conclude that Congress had authorized the Postal Service to promulgate firearms regulations stricter than section 930(a), we would still have grave doubts that the Postal Service's regulation is consistent with the Second Amendment for the reasons discussed in Part II.B, *supra*. We would therefore still conclude, under the strong form of the constitutional-avoidance canon, *see Application of 28 U.S.C. § 458*, 19 Op. O.L.C. at 350–57, that the Postal Service must permit that lawful carrying of protected firearms for self-defense in post offices open to the public, *see supra* note 11 (discussing the canon of constitutional avoidance).